Cynthia J. STENCEL, Plaintiff,

v.

AUGAT WIRING SYSTEMS and Thomas & Betts Corporation, Defendants.

No. 99–72945.

United States District Court,
E.D. Michigan,
Southern Division.

Aug. 13, 2001.

Lawrence S. Katkowsky, Lawrence S. Katkowsky Assoc., Bingham Farms, MI, for Plaintiff.

William L. Hooth, Cox, Hodgman, Troy, MI, for Defendants.

### OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

BORMAN, District Judge.

Before the Court is Defendants' Motion for Summary Judgment (Docket Entry # 24). The Court heard oral argument on this motion on August 8, 2001. Upon consideration of the motion, the submissions of the parties, and the applicable law, the Court hereby GRANTS Defendants' Motion for Summary Judgment and DISMISSES the case.

### BACKGROUND

Plaintiff Cynthia Stencel (Plaintiff) applied to work for Defendant Augat Wiring Systems, Inc. (Defendant Augat Wiring) in September of 1995. At the time of her application, Plaintiff signed an Employment Application, which read in relevant part:

I understand that this employment application is not a contract of employment. In all circumstances, employment with Augat is "at will," which means that either Augat Inc. or I can terminate the employment relationship at any time with or without prior notice, and for any reason not prohibited by statute. I further understand that any oral or written statements to the contrary are hereby expressly disavowed and should not be relied upon by me in any prospective employment considerations.

*Defendants' Tab A, pp. 11, 17 and Exh. 1 to Tab A.*

Plaintiff began working for Defendant Augat Wiring in October of 1995, and shortly thereafter received a copy of Defendant Augat's Work Rules. *Defendants' Tab A, pp. 55–59 and Exh. 5 to Tab A.* Plaintiff signed that she had read and understood the Work Rules on October 11, 1995. *Id.*

Defendant Thomas & Betts (Defendant Thomas & Betts) acquired Defendant Augat Wiring in February of 1997. Plaintiff received a new copy of the Work Rules, which merely replaced Defendant Thomas & Betts as the employer listed on the form, but retained the substance of the rules. *Defendants' Tab A, pp. 55–56 and Exh. 6 to Tab A.* Plaintiff signed that she had read and understood the Work Rules on February 26, 1997. *Id.*

Both sets of Work Rules, *see Exhs. 5 and 6 to Defendants' Tab A,* begin by stating that "the rules listed below are designed to fairly and impartially regulate employees actions in order to obtain and maintain an orderly and proper work place." The Work Rules also explicitly state that "they are not intended to provide an all encompassing list of work rules. Employees are encouraged to contact their supervisors for information about other company policies."

There is a statement in the first paragraph of the Work Rules which provides that "no employee will be discharged until the matter has been carefully reviewed by management. All [sic] termination's require the joint approval of both the Plant/Departmental Manager and Human Resources."

The Work Rules do contain provisions regarding infractions which, if committed, could subject the employee to a verbal warning or to discharge, depending on the seriousness of the infraction. Thirteen items are listed under one category which, if committed, would result in "disciplinary action." Twenty-one items are listed under the "most serious" category and carry a penalty of "suspension and/or termination without warning." At the conclusion of the "most serious" section, a paragraph entitled "Other Regulations" reads as follows:

The above infractions are not intended to provide an all encompassing list of work rules. As such, any act conducted in willful disregard to the Company or employees' interests will be considered

an action in which appropriate disciplinary action will be taken.

*Defendants' Tab A, Exhs. 5 and 6.*

On May 8, 1998, Defendants were informed that Plaintiff made a statement to coworkers about bringing a gun to work and starting with it in the front office. *Defendants' Tab C, p. 22; Tab F, pp. 88–90, 92–93, 95–96.*[1] Chene Dompier, the Human Resources Administrator, stopped Plant Manager Don Dakoske before he went into the plant that morning to report Plaintiff's statement. According to Dakoske, Dompier was "very upset. Visibly shaken." *Defendants' Tab C, p. 22.* Dakoske told Dompier that he would investigate the situation to determine whether Plaintiff posed an immediate threat. He also advised Dompier not to confront Plaintiff or to go into the plant. *Id. at 23.* Dakoske began an investigation into the allegations, but turned the investigation over to Gene Salas, the Company's Human Resources Manager. *Defendants' Tab C, pp. 23–28.* By May 12, eight employees had been interviewed who were believed to have heard or heard about Plaintiff's statement. *Defendants' Tab C, pp. 23–27; Tab D, pp. 30, 36–37 and Exh. 7 to Tab D.* Three of the eight employees confirmed that they were present and heard Plaintiff's statement. *Defendants' Tab C, pp. 25–27; Tab D, pp. 40–43 and Exh. 7 to Tab D; Tab G, pp. 20, 34–35, 38; Tab H, pp. 9.11, 13, 18–19, 29–30, 36–38.*

Judy Kalbfleisch wrote out a statement in which she reported that she heard Plaintiff say, "I should bring in an [sic]

---

**1.** **(1)** Contrary to Plaintiff's statement that she spoke only to Lawrence Zonca and Sally Jankowski, Judy Kalbfleisch wrote a statement that she heard it; Theresa Hess testified that she heard the conversation as well. *Defendants' Tab H, p. 13.* **(2)** Sally Jankowski told others in the bathroom, perhaps including Judy Kalbfleisch. **(3)** Nancy Piehl (Kal-

bfleisch's sister) told Cherie Dompier that Dompier needed to talk to Kalbfleisch. **(4)** Kalbfleisch told Dompier (that Plaintiff made statements in the lunchroom). **(5)** Sandy O'Brien subsequently reported to Dompier that she overheard Sally Jankowski in the bathroom reporting what Plaintiff said. **(6)** Dompier told Dakoske.

oozi in the plant and start in the front office." *Defendants' Tab D, p. 30, 49 and Exh. 7 to Tab D.* Kalbfleisch also wrote that she felt Plaintiff's statement "[en]danger[ed] the employees in the front office." *Id.; Defendants' Tab C, p. 24.* Other front office employees, Sandy O'Brien, Nancy Piehl and Kathy Hunt, also stated that they felt threatened by the statement. *Defendants' Tab C, pp. 23–24; Tab D, pp. 39–40, 70 and Exh. 7 to Tab D; Tab F, pp. 93–97, 110–11.*

Plaintiff also was interviewed on May 12 regarding her alleged statement. She explained that she made the statement in reference to a former postal worker who had been hired recently by her husband's employer. *Defendants' Tab A, p. 69; Tab D, pp. 45–46.* At the conclusion of the interview, Salas told Plaintiff that "people here are scared of you," asked her to leave the building and told her she was suspended pending an investigation. He further stated that he would be in touch with her. *Defendants' Tab A, pp. 18–19, 81, 83–4; see Tab D, p. 48.*

Three days later, on May 15, 1998, Don Dakoske, Gene Salas and Cherie Dompier participated in a telephone call with Plaintiff.[2] During that call, Plaintiff stated that she "had been informed not to talk to the company" and told Dakoske and Salas to contact her attorney. *Defendants' Tab A, p. 100.*

Salas presumed that Plaintiff would not be returning to work at Defendant Thomas & Betts and told Dick DeGeorge so, the Human Resources Director, as well as Cherie Dompier. *Defendants' Tab D, pp. 14, 68; Tab F, p. 113.* Plaintiff was considered to have voluntarily resigned, and a note to that end was placed in her personnel file. *Defendants' Tab E, ¶ 14.*

Subsequently, the Michigan Employment Security Commission (MESC) notified Defendants after the telephone conversation that Plaintiff filed for unemployment benefits on May 13, 1998, prior to her conversation with Dakoske and Salas. The MESC requested information from Defendants about the circumstances surrounding Plaintiff's "separation" from the company and to "list all disciplinary action initiated prior to separation." *Defendants' Tab E, ¶ 10; Tab F, pp. 49–54 and Exh. 5 to Tab F.* Cherie Dompier, under the direction of Mr. Salas, replied to the MESC that Plaintiff had not been terminated, but that she was suspended pending investigation of a work rule violation, and as a result of her filing for unemployment benefits, was considered to have voluntarily resigned. *Defendants' Tab F, pp. 53–54 and Exh. 5 to Tab F.* Plaintiff never returned to work for Defendants.

On May 12, 1999, Plaintiff filed this case, originally in Macomb County Circuit Court alleging the following: (1) Count I: wrongful discharge; (2) Count II: violations of ERISA; and (3) Count III: defamation, against her employers Augat Wiring Systems and Thomas & Betts Corp. Defendants were served on May 27, 1999.

Defendant Thomas & Betts Corp. filed a petition for removal on June 10,1999, alleging removal was proper because Count II, violations of ERISA, gave the court federal question jurisdiction.

Subsequently, on June 15, 2000, the parties filed a stipulation of dismissal of Count II. The Court granted the dismissal order which provides that Count II is dismissed with prejudice and without costs to either side.

---

**2.** Dakoske testified that he tried to call Plaintiff twice before May 15 but that he was unsuccessful in reaching her. *Defendants' Tab C, p. 39.*

Now before the Court are two claims under Michigan law for wrongful termination and defamation. Defendants filed the present motion for summary judgment, to which Plaintiff responded.

## ARGUMENTS

### I. Defendants' Arguments

Defendants' first argument is that Plaintiff was employed pursuant to an express at-will employment agreement. As such, Plaintiff's claim of breach of an implied contract must fail. Defendants rely on the application form Plaintiff signed which provides that the employment relationship would be an at-will relationship; this is called an express at-will agreement. Defendants rely on Sixth Circuit and Michigan law which holds that where there is an express at-will employment agreement, there cannot also be an implied contract covering the same employment relationship.

Defendants' second argument as to Count I is that even if the Court disregarded the express at-will agreement, Plaintiff has not shown that an implied contract has been created. When viewed in conjunction with the application form Plaintiff signed, the Work Rules cannot be said to have created a promise on which Plaintiff could rely as having created a just cause employment relationship.

In support of the second argument, Defendants rely on *Lytle v. Malady,* 458 Mich. 153, 579 N.W.2d 906 (1998), a case in which the Michigan Supreme Court held that to survive summary judgment, an employee must provide sufficient evidence to raise a fact issue "that the policy arguably instilled a legitimate expectation that superseded the express contractual disclaimer." *Id.* at 913, n. 16. Plaintiff has not raised a triable issue, nor has Plaintiff shown that any implied contract superseded the express at-will agreement she signed. Accordingly, Defendants contend that Count I must be dismissed.

Assuming that Plaintiff could show that the express at-will agreement was superseded by an implied contract, Plaintiff cannot show that Defendants breached any such implied contract. Plaintiff has not shown that she was fired contrary to the terms of any implied contract. Plaintiff has testified repeatedly that she was not terminated by Defendants. *See Defendants' Tab A, pp. 7–8, 18–20.*

Defendants also respond to a retaliatory discharge claim embedded in Count I. Plaintiff suggests that her alleged discharge was based on her filing a claim for unemployment benefits under the Michigan Employment Security Act (MESA), Mich. Comp. Laws Ann. § 421.1. Defendants assert that no Michigan court has considered whether a discharge for seeking unemployment benefits provides a basis for a retaliatory discharge claim. Defendants first reiterate that in the absence of a contractual basis for holding otherwise, either party in an employment relationship may terminate at-will. Three exceptions to this presumption, discussed *infra* at pp. 15–16, have been recognized by the Michigan Supreme Court, none of which is present here. *Phillips v. Butterball Farms Co., Inc.,* 448 Mich. 239, 244, 531 N.W.2d 144 (1995).

Defendants' next argument is that Plaintiff's implied contract claim blocks her retaliatory discharge claims based on *Kostello v. Rockwell International Corp.,* 189 Mich.App. 241, 472 N.W.2d 71 (1991). Under Michigan law, Defendants assert that a plaintiff cannot bring a tort claim based on the same facts that provide the basis for a contract claim. Thus, Plaintiff's claim based on retaliatory discharge cannot be sustained as an independent basis for recovery from the contract claim.

Defendants' final argument regarding Count I is that Plaintiff cannot establish that she was discharged in retaliation for filing a claim for unemployment benefits—because the law requires that Plaintiff prove the application for benefits was a "significant factor" in her discharge. *Kunz v. United Food & Commercial Workers, Local 876*, 5 F.3d 1006, 1012 (6th Cir.1993). Defendants emphasize that Plaintiff admits she was not discharged. Rather, the evidence shows that she resigned. Second, Plaintiff has not established a causal connection between her claim for unemployment benefits and the termination of her employment.

That Defendants noted Plaintiff's filing for unemployment benefits, and that this provided them with evidence that she had indeed resigned, provided a logical basis for their assumption that she had resigned. That Defendants thereafter included this reason in its response to Plaintiff's request for benefits, is merely a significant, appropriate justification for Defendants' response, and does not establish any retaliatory motive for the termination of her employment by Defendant.

Defendants' also challenge Plaintiff's defamation claim. According to the Complaint and to the Answers to Interrogatories, Plaintiff's defamation claim is based on a co-worker's statements made to a clerk at the Shell gas station nearby that "they had fired Cindy because she was coming in the front office with a gun." *Defendants' Tab B, Interrogatory 16; Tab A, pp. 107–110, 271–72*. Rhonda Hankins, the alleged speaker, who was named a defendant but has subsequently been dismissed from the case, was not a supervisor, did not make the statements at the workplace, did not make the statements during work time and did not do so on behalf of Defendants. Thus, even if Hankins made the statements, there is no basis

for imputing liability to Defendants, and Plaintiff's claim must fail.

## II. Plaintiff's Response

Plaintiff first claims that the Work Rules were the only rules enforced by Defendants. Plaintiff had to sign both of the Work Rules forms, and as such, she should be able to rely on them as the rules governing her employment. Relying on *Toussaint v. Blue Cross & Blue Shield of Michigan*, 408 Mich. 579, 292 N.W.2d 880 (1980), Plaintiff claims that an enforceable agreement could result from either (1) an employer's express agreement, oral or written, or (2) an employee's legitimate expectations grounded in an employer's policy statements. *Id.* at 598, 292 N.W.2d 880.

Plaintiff contends that this case is similar to *Damrow v. Thumb Cooperative Terminal, Inc.*, 126 Mich.App. 354, 337 N.W.2d 338 (1983), a case in which an employee policy manual was held to have created an enforceable agreement between the company and the employees such that employees had to be discharged based on the terms of the manual. Plaintiff points to the provision in the Work Rules that states:

> However, no employee will be discharged until the matter has been fully reviewed by management. All terminations require the joint approval of both the Plant/Departmental Manager and Human Resources.

*Defendants' Tab A, Exhs. 5 and 6.*

Plaintiff's next argument is that she can sustain a breach of contract claim based on her constructive discharge from Defendants' employ because (1) Plaintiff was not formally discharged; (2) Defendants escorted Plaintiff off the work-site; (3) Plaintiff was suspended without pay; (4) Defendants told the MESC that Plaintiff was considered to have resigned by virtue of

her filing for unemployment benefits; and (5) Defendants never called Plaintiff back to work. Thus, because the Work Rules created an implied contract, and because Defendants did not discharge Plaintiff according to the Work Rules, a jury could find that Plaintiff was constructively discharged.

Plaintiff's version of events is as follows: (1) She talked about guns in the workplace in the context of an employee who had been hired at her husband's company; (2) some co-workers who heard the conversation misread her meaning and reported it to Defendants' management as though she was talking about shooting up the company's front offices; (3) Plaintiff was not allowed to explain the context of her statements; (4) Plaintiff was escorted off the worksite and was told she was suspended without pay pending an investigation; (5) she was told through the MESC papers that Defendants considered her to have resigned because she filed for unemployment benefits; and (6) she was never called back to work.

Plaintiff's next argument is that an allegation that she was discharged for filing a claim for unemployment compensation benefits after she had been suspended without pay states a tortious cause of action. Plaintiff contends that filing for unemployment benefits is exercising a right pursuant to a well-established legislative enactment. As such, her retaliatory discharge claim for filing for benefits states a claim. Plaintiff suggests that Defendants used the notice from the MESC as a pretext for her termination.

As to the retaliatory discharge claim based on Plaintiff's filing for unemployment benefits, Plaintiff contends that Defendants cannot get around the fact that they told MESC Plaintiff was considered to have resigned based on her filing for unemployment benefits.

Finally, with respect to defamation, Plaintiff asserts that Judy Kalbfleisch, a non-supervisory employee working in the press room, made statements to Cherie Dompier that Plaintiff had said she would bring an Uzi to work and start in the front office. Dompier was upset by what Kalbfleisch said. Dompier went to Don Dakoske and reported what she had been told by Kalbfleisch, setting Defendants' investigation into motion.

Based on the foregoing, Plaintiff claims that she has made out a prima facie case of defamation. Plaintiff suggests that Kalbfleisch was acting in her duty as an employee when she reported to Dompier what Plaintiff had allegedly said. Moreover, her report was untrue and published to a third party on the work premises. Accordingly, Plaintiff has met her burden, and the motion must be denied as to the defamation count.

## *ANALYSIS*

### *I. Supplemental Jurisdiction*

■ Defendants properly removed this case based on federal question jurisdiction due to Count II of Plaintiff's Complaint. While Count II, violations of ERISA, has been dismissed from the case by order dated June 6, 2000, the Court exercises supplemental jurisdiction over the other two counts pursuant to 28 U.S.C. § 1367(a), which provides that "the district court shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy."

■ District courts have wide discretion in determining whether to exercise supplemental jurisdiction. *Pinney Dock & Transport Company v. Penn Central Corporation,* 196 F.3d 617, 620 (6th Cir.1999). This discretion must be exercised while considering "judicial economy, conve-

nience, fairness and comity." *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988); *see also Musson Theatrical, Inc. v. Federal Express Corp.,* 89 F.3d 1244, 1254 (6th Cir.1996) *as amended,* 1998 WL 117980 (6th Cir. Jan. 15, 1998).

Based on these four factors, the Court exercises supplemental jurisdiction over Counts I and III and proceeds with the following analysis.

## II. Summary Judgment Standard

Summary judgment is proper when "a party ... fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This Court affirms summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Telespectrum, Inc. v. Public Serv. Comm'n of Ky.,* 227 F.3d 414 (6th Cir. 2000).

While the Court reviews the evidence in the light most favorable to the nonmoving party, "the nonmoving party is required to do more than simply show that there is some 'metaphysical doubt as to the material facts.'" *Pierce v. Commonwealth Life Ins.,* 40 F.3d 796, 800 (6th Cir.1994) (quoting *Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). The nonmoving party "must present more than a mere scintilla of evidence in support of [her] position; the [nonmoving party] must present 'evidence on which the jury could reasonably find for [her].'" *Hartsel v.*

*Keys,* 87 F.3d 795, 800 (6th Cir.1996), *cert. denied,* 519 U.S. 1055, 117 S.Ct. 683, 136 L.Ed.2d 608 (1997) (quoting *Anderson v. Liberty Lobby,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

## III. Breach of Implied Contract

Count I of Plaintiff's Complaint asserts two claims: (1) breach of an implied contract based on the Work Rules and (2) retaliatory discharge based on Plaintiff filing an unemployment benefits claim with the MESC.

■ **Breach of Implied Contract.** At the time of her application, Plaintiff signed an Employment Application on September 6, 1995, which read in relevant part:

> I understand that this employment application is not a contract of employment. In all circumstances, employment with Augat is "at will," which means that either Augat Inc. or I can terminate the employment relationship at any time with or without prior notice, and for any reason not prohibited by statute. I further understand that any oral or written statements to the contrary are hereby expressly disavowed and should not be relied upon by me in any prospective employment considerations.

*Defendants' Tab A, pp. 11, 17 and Exh. 1 to Tab A.* This is called an express at-will contract.

■ Michigan law is clear with respect to express at-will contracts: if a prospective employee signs an application or agreement within which it is made clear that the employment relationship will be at-will, the employer has done all that is required to notify employees of the nature of the employment relationship. *Reid v. Sears Roebuck and Company,* 790 F.2d 453, 462 (6th Cir.1986). *Toussaint v. Blue Cross & Blue Shield of Michigan,* 408

Mich. 579, 292 N.W.2d 880 (1980), the seminal Michigan employment case, held that employers can avoid any misunderstanding over employment terms by "requiring prospective employees to acknowledge that they serve [ ] at the will or pleasure of the company...." *Toussaint,* 408 Mich. at 612, 292 N.W.2d 880. Defendants did as the law requires. Plaintiff was made aware at the time she applied for the job with Defendants that the employment relationship was at-will.

■ While *Toussaint* holds that there may be an implied contract that employment may be terminated only for good cause, *Toussaint* does not hold that this is the case where an express contract makes the terms of the employment at will. "It is well settled in Michigan that there cannot be an implied contract covering the same subject as an express one." *Reid,* 790 F.2d at 462 (citations omitted).

Plaintiff was an at-will employee made so by an express agreement which she signed prior to being hired. Thus, her claim for breach of an implied contract fails as a matter of law. Defendants' Motion for Summary Judgment as to this part of Count I is granted.

■ However, even if the Court were to find that the employment agreement did not clearly establish an at-will relationship, Plaintiff cannot show that there was an implied contract. In *Lytle v. Malady,* 458 Mich. 153, 579 N.W.2d 906 (1998), the Michigan Supreme Court addressed whether the plaintiff had a legitimate expectation to be fired only for just cause based on an employee handbook she received when hired. The handbook stated that it should not be interpreted to create a contract relationship between the employer and employee. The handbook also included the following statement: "No employee will be terminated without proper cause or reason and not until the manage-

ment has made a careful review of the facts." *Lytle,* 458 Mich. at 162, 579 N.W.2d 906.

The court outlined Michigan employment law, *Lytle,* 458 Mich. at 163–64, 579 N.W.2d 906, and found that the policy stated in the handbook was "insufficient to overcome the strong presumption of employment at will, particularly where the original handbook also provided that '[t]he contents of this booklet are not intended to establish ... any contract between ... [the employer] and any employee or group of employees.'" *Lytle,* 458 Mich. at 166, 579 N.W.2d 906. The court found that the statement in the employee handbook did not make a promise, nor did it create a legitimate expectation in a reasonable employee that she would be fired only for just cause. *Id.*

Likewise, in this case, the Work Rules state the following provisions: (1) The Work Rules "are not intended to provide an all encompassing list of work rules." (2) Employees are encouraged to contact their supervisors for information about other company policies. (3) The "Other Regulations" paragraph reads as follows:

> The above infractions are not intended to provide an all encompassing list of work rules. As such, any act conducted in willful disregard to the Company or employees' interests will be considered an action in which appropriate disciplinary action will be taken.

*Defendants' Tab A, Exhs. 5 and 6.* Considering these provisos along with the employment agreement which clearly states that the employment relationship is at-will, this case is controlled by *Lytle,* and as such, no implied contract can be found. Defendants made no promises in the Work Rules on which Plaintiff could legitimately rely that she was a just cause employee. *Lytle,* 458 Mich. at 164–65, 579 N.W.2d

906. Accordingly, no genuine issue of material fact remains, and Defendants' motion is granted.

**Retaliatory Discharge.** The second part of Plaintiff's Count I alleges that Plaintiff was discharged in retaliation for filing for unemployment benefits.

■ Michigan law clearly holds that "either party to an employment contract for an indefinite term may terminate it at any time for any, or no, reason." *Suchodolski v. Gas Co.*, 412 Mich. 692, 695, 316 N.W.2d 710 (1982); *see generally Toussaint v. Blue Cross & Blue Shield of Michigan*, 408 Mich. 579, 292 N.W.2d 880 (1980). However, there is an exception recognized by Michigan courts: some grounds for discharging an employee are so contrary to public policy that they are actionable. *Suchodolski*, 412 Mich. at 695, 316 N.W.2d 710; *see also Sventko v. Kroger*, 69 Mich. App. 644, 647, 245 N.W.2d 151 (1976). These prohibitions are generally found in "explicit legislative statements prohibiting the discharge, discipline, or other adverse treatment of employees who act in accordance with a statutory right or duty." *Id.*

Three examples of this type of public policy case recognized in *Suchodolski*, and subsequent cases include firing an employee (1) in violation of an explicit legislative statement prohibiting discharge of employees who act in accordance with a statutory right or duty; (2) for the failure or refusal to violate the law in the course of employment; and (3) for exercising a right conferred by a well-established legislative enactment. *Edelberg v. Leco Corporation*, 236 Mich.App. 177, 180, 599 N.W.2d 785 (1999); *Suchodolski*, 412 Mich. at 694–95, 316 N.W.2d 710.[3]

■ Plaintiff contends that her discharge was in retaliation for filing a claim for unemployment benefits; thus, her claim would fall under the third type of public policy case. The Michigan Employment Security Act, MICH. COMP. LAWS ANN. § 421.1, was enacted primarily for the benefit of persons involuntarily unemployed, and its purpose is to lighten the burden of economic insecurity on those who become unemployed through no fault of their own. *Empire Iron Min. Partnership v. Orhanen*, 455 Mich. 410, 565 N.W.2d 844 (1997). Like the Worker's Disability Compensation Act (WDCA), MICH. COMP. LAWS ANN. § 418.101, the MESA is a legislative construct intended to provide relief from hardship caused by involuntary unemployment. *Paschke v. Retool Industries*, 445 Mich. 502, 519 N.W.2d 441 (1994).

■ The question here is whether Plaintiff was involuntarily discharged or whether she resigned. The facts in the record are clear and made clearer by Plaintiff's own testimony: On May 12, 1998, Plaintiff was suspended pending an investigation.[4] On May 12, as he escorted her off the premises, Salas told Plaintiff he would be in touch with her. On May 15, 1998, Salas, Dakoske and Dompier called Plaintiff. She declined to talk to them and told them to contact her attorney. Subsequently, Defendants were contacted by the MESC regarding an unemployment benefits claim filed by Plaintiff on May 13, prior to her telephone conversation with Salas and Dakoske and only one day after she was suspended. An employee files a claim for unemployment benefits *after* she is discharged, or otherwise terminated from em-

---

**3.** The most common legislative acts include The Elliott–Larsen Civil Rights Act, MICH. COMP. LAWS ANN. § 37.2701. The Handicappers' Civil Rights Act, MICH. COMP. LAWS ANN. § 37.1602, The Occupational Safety and Health Act, MICH. COMP. LAWS ANN. § 408.1065, and the Whistleblowers' Protection Act, MICH. COMP. LAWS ANN. § 15.362.

**4.** Defendants' Tab A, pp. 7–8, 18–19.

ployment. Here, Plaintiff was not terminated from employment. Plaintiff was merely suspended pending an investigation. There is a clear distinction between being fired and being temporarily suspended for investigation, even if that temporary suspension is without pay. Further, Plaintiff filed for unemployment benefits the day of or the day after she was suspended, rather than proceed to deal with the issue with the Defendant.

Thus, after being rebuffed in trying to speak with Plaintiff on May 15, who told them to talk to her attorney, and then after receiving notice from the MESC about Plaintiff's claim for unemployment benefits filed on the day or day after she was suspended, Defendants could reasonably assume that she had resigned. Plaintiff never called the company back, nor did her attorney. Nor did Plaintiff inform the company of the name of her attorney.

Further, in opposition to Plaintiffs claim of retaliatory discharge, there is unrefuted evidence that Defendant, prior to any knowledge that Plaintiff had filed for unemployment benefits, had decided to terminate her employment in that May 15th phone call, by either accepting her resignation or by firing her. That telephone conversation never reached that issue because Plaintiff refused to talk and told Defendants to talk to her attorney.

That the Defendants were unable to reach that termination issue in the May 15 conversation with Plaintiff, because she abruptly directed them to speak with her attorney, does not undermine the evidence of Defendants' intent to terminate Plaintiff before being notified of her claim for unemployment benefits. Plaintiff's claim that she was terminated as a result of her filing for unemployment benefits is unsupported by the facts.

Plaintiff has not shown that her discharge from Defendants was at all causally connected to her exercise of "a right conferred by a well-established legislative enactment," i.e., filing for unemployment benefits pursuant to the MESA. *Edelberg*, 236 Mich.App. at 180, 599 N.W.2d 785; *Suchodolski*, 412 Mich. at 694–95, 316 N.W.2d 710. No public policy has been violated where Plaintiff resigned and was not discharged and where Defendants were prepared to ask for her resignation or to fire her based on her violation of the Work Rules before finding out that she had applied for benefits. There is simply no causal connection. Accepting all of Plaintiff's factual allegations as true, her claim still fails as a matter of law. Accordingly, Plaintiff's claim of retaliatory discharge cannot lie, and the motion is granted as to this part of Count I.

### IV. Defamation

The elements of a defamation claim include:

(1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged publication to a third party, (3) fault amounting to at least negligence on the part of the publisher, and (4) either actionability of the statements irrespective of special harm, or the existence of special harm caused by the publication. These elements must be specifically pleaded, including the allegations with respect to the defamatory words, the connection between the plaintiff and the defamatory words, and the publication of the alleged defamatory words. (Internal citations omitted.)

*Gonyea v. Motor Parts Federal Credit Union*, 192 Mich.App. 74, 77, 480 N.W.2d 297 (1991); *see also Linebaugh v. Sheraton Mich. Corp.*, 198 Mich.App. 335, 338, 497 N.W.2d 585 (1993).

With respect to an employment situation, the defamation must have oc-

curred while an employee was in the discharge of his duties as an agent for the employer, or the defamation must have occurred in relation to a matter about which the employee's duties as an agent required him to act. *Linebaugh*, 198 Mich.App. at 341, 497 N.W.2d 585.

In the present case, the Complaint states that Rhonda Hankins,[5] John Doe and Mary Roe falsely accused Plaintiff of stating that "she (Plaintiff) was coming to the front office with a gun..." *Complaint*, at ¶ 33. As a result of this statement, Plaintiff claims she was harmed in her employment because it was the impetus for her alleged firing from Defendants. Moreover, Plaintiff's Answer to Interrogatory # 16 refers only to Hankins' alleged statements. The Complaint has not been amended, nor have the discovery answers been updated.

 Given that Rhonda Hankins was dismissed as a defendant, and given that no other individual defendants have been named as defendants, there is no actionable defamation claim. A defamation claim must be pleaded with particularity. *Gonyea*, 192 Mich.App. at 77, 480 N.W.2d 297. While Plaintiff does name an additional person as having made the statement in her Response Brief, Judy Kalbfleisch, Plaintiff has not named Kalbfleisch as a defendant.

 On a separate tack, Plaintiff's claim also fails. Plaintiff admitted at her deposition that she made a statement about guns in the workplace:

**Question**: Now you admit that you made a statement about coming to the front office with a gun during a discussion that you had with some of your coworkers in Augat's lunchroom; correct?

**Answer**: Correct.

*Defendants' Tab A, p. 65.*

Thus, even if Plaintiff had pled this claim with the requisite particularity, she cannot show that the alleged statement by Kalbfleisch was false. Further, even if the Court overlooked that defamation has not been pled with particularity, Plaintiff cannot show that Judy Kalbfleisch was "in the discharge of her duties for the employer" (Kalbfleisch is a machine operator who, incidentally, has a sister working in Defendant's front office), nor can Plaintiff show that Kalbfleisch was required to act as she did based on her job description. *Linebaugh*, 198 Mich.App. at 341, 497 N.W.2d 585.

Plaintiff cannot establish a defamation claim based on the facts as alleged. Further, Plaintiff has failed to plead defamation with particularity. Accordingly, Defendants' motion as to the defamation claim must be granted.

### ORDER

Based on the foregoing, the Court hereby GRANTS DEFENDANTS' MOTION FOR SUMMARY JUDGMENT and dismisses the case.

SO ORDERED.

---

5. Hankins was originally named as a defendant but was dismissed on January 19, 2001.

No other individual defendants have been named.