448 F.2d 501
 The UNION CENTRAL LIFE INSURANCE COMPANY, Plaintiff,
v.
HAMILTON STEEL PRODUCTS, INC., et al., Defendants.
Agnes O'Brien, et al., Defendants-Appellants,
Nathan Yorke, as Trustee of the Estate of Hamilton Steel Products, Inc., a Bankrupt, Defendant-Appellee,
Tom Webb, et al., Defendants-Appellees.
 Nos. 18631-18632.
 United States Court of Appeals, Seventh Circuit.
 September 14, 1971.
 
 George Kaye, Patrick W. Dunne, Chicago, Ill., for defendants-appellants.
 Norman H. Nachman, Gerald F. Munitz, Gilbert Feldman, Kleiman, Cornfield & Feldman, Chicago, Ill., for defendants-appellees, Tom Webb, and others.
 Before CASTLE, Senior Circuit Judge, and KERNER and PELL, Circuit Judges.
 PELL, Circuit Judge.
 
 
 1
 As a stakeholder, plaintiff Union Central Life Insurance Company (Union Central) brought this interpleader action seeking a declaration of the rights of the various parties under a group annuity insurance policy (annuity policy) issued by it to defendant Hamilton Steel Products, Inc. (Hamilton), now bankrupt.
 
 
 2
 Appeals involving different aspects of the litigation arising out of the policy in question have been twice before this court. Union Central Life Ins. Co. v. Hamilton Steel Products, Inc., 374 F.2d 820 (7th Cir. 1967), and United Steelworkers of America, A.F.L.-C.I.O. v. Hamilton Steel Products, Inc., 404 F.2d 878 (7th Cir. 1968).
 
 
 3
 Hamilton purchased the annuity policy from Union Central as a means of funding a pension plan agreement entered into by it and the United Steelworkers of America, A.F.L.-C.I.O. (Steelworkers) pursuant to a collective bargaining agreement between them. Under the policy, Hamilton was required to make an annual payment on December 15 and its failure to do so would result in the lapse of the policy. On December 15, 1964, Hamilton, having already filed for an arrangement under the Bankruptcy Act, failed to make the annual payment required and the policy lapsed.
 
 
 4
 Union Central named several individuals, classes and organizations as defendants in this interpleader action. Among the named defendants were Hamilton, Nathan Yorke, its trustee in bankruptcy (Trustee), and individual representatives of the local union representing Hamilton's employees. In addition, three major classes of Hamilton's former employees were named. Composing the first class are 32 "prior benefit" employees having certain concededly vested rights under the annuity policy by virtue of their participation in an earlier Hamilton pension plan. The second class, designated "Class C," consists of the 190 employees who were still employed by Hamilton on the day the annuity policy lapsed, December 15, 1964. Their employment was terminated on that day. The third class, "Class D," is made up of 28 employees who were separated from Hamilton's employ within six weeks prior to December 15, 1964. There is no real dispute of the fact that their separation, like that of Class C employees, was the direct result of Hamilton's impending bankruptcy.
 
 
 5
 The basic question on this appeal is which employees are entitled to share in the fund remaining after payment of the prior benefit claims, which remainder Union Central has deposited in the court until the proper plan of distribution has been finally determined.
 
 
 6
 The district court, granting the Trustee's motion for judgment on the pleadings, awarded the entire fund to 25 members of the 190 member Class C who had at least 15 years of continuous employment with Hamilton prior to its bankruptcy and their termination. The Trustee and the union representatives support this resolution of the problem. The neglected members of Class C and Class D oppose it.
 
 
 7
 Before turning to the merits of the various claims made on the fund, we must address the contention of the Class C and Class D employees that the Trustee and the union representatives are not proper parties in this court. We find no merit in such contention. It is indisputable that the Trustee and the union representatives were proper parties when this interpleader action was filed by Union Central. All that is required by the interpleader statute, 28 U.S.C. § 1335, is that they be "adverse claimants * * * [who] are claiming or may claim to be entitled to * * * money [held by the stakeholder]."
 
 
 8
 "The remedy of interpleader should, of course, be a simple, speedy, efficient and economical remedy." Hunter v. Federal Life Ins. Co., 111 F.2d 551, 557 (8th Cir. 1940). "[T]he purpose of an interpleader bill is as much to protect a stakeholder from the expense of double litigation, however groundless, as it is to protect him from the risk of double liability." Metropolitan Life Ins. Co. v. Segaritis, 20 F.Supp. 739, 741 (E.D.Pa.1937). Given this purpose to protect the stakeholder, it has been repeatedly held that so long as there exists a "real and reasonable fear of exposure to double liability or the vexation of conflicting claims * * *, jurisdiction in interpleader is not dependent upon the merits of the claims of the parties interpleaded * * *." Bierman v. Marcus, 246 F.2d 200, 202 (3rd Cir. 1957), cert. denied sub nom., Milmar Estate, Inc. v. Marcus, 356 U.S. 933, 78 S.Ct. 774, 2 L.Ed.2d 762 (1958).
 
 
 9
 Of course, the claims of some interpleaded parties will ultimately be determined to be without merit. That, however, is the very purpose of the proceeding and it would make little sense in terms either of protecting the stakeholder or of doing justice expeditiously to dismiss one possible claimant because another possible claimant asserts the claim of the first is without merit. This is particularly so where the allegedly non-meritorious claim has prevailed in the trial court.
 
 
 10
 The underlying rationale of interpleader proceedings would dictate ordinarily that parties having possible claims be retained in the status of parties to be bound by the final decree until the final decree is a fait accompli.
 
 
 11
 Further, we note that the Trustee contends that if the cause should be remanded, a separate class should be established for the 25 thus-far successful claimants inasmuch as their position as Class C members creates a conflict of interest within the class. Both the union representatives and the Trustee have capably and strenuously, however, advanced the interest of the 25 claimants, without which we might well have been of the opinion that their interests had not been fairly represented.
 
 
 12
 We turn then to the merits of the claims made on the fund by the various defendants. The Trustee and union representatives rely on the retirement provisions of the annuity policy in support of the trial court's award of the fund to the 25 long-term employees. Under those provisions, an "employee is entitled to an annuity upon his retirement," (Section A 2), which commences upon his "normal retirement date," (Section A 3), defined as the "date upon which he attains the age of 65 years or the date upon which he has completed 15 years of service with Employer, whichever is the later." (Section B 1).
 
 
 13
 As the union representatives concede, a literal reading of the policy requires both 15 years of service and the attainment of age 65 to qualify for retirement benefits. On this reading, none of the Class C or Class D employees qualify for retirement benefits. However, the Trustee and union representatives assert that the 25 claimants successful below, being the only ones with more than 15 years of service, may be singled out for benefits at the expense of other claimants by ignoring the age 65 requirement. The only justification offered for thus ignoring the literal requirements of the policy is that the Trustee and the union representatives have agreed to this "interpretation."
 
 
 14
 The difficulty with this and with the various arguments offered in support of the right of the union and the Trustee to alter the annuity policy is that the relevant agreements make clear that the policy may be altered only by the mutual agreement of Hamilton and Union Central and that neither the union nor the employees it represents have any right to dictate or alter terms of the annuity policy by which the pension plan was funded.
 
 
 15
 If the policy fails to comply with the intent of the parties to the pension plan agreement, as to which we do not reach any conclusion, the time for having required such conforming provisions was at the time of the purchase of the policy not now, when rights have become fixed by the policy terms.
 
 
 16
 In the pension plan agreement, the union agreed that Hamilton "is free to determine the manner and means of making provision for funding and paying the pension benefits set forth in this agreement." The annuity policy chosen as the funding means then provides that Hamilton "has all rights reserved under this policy and may agree with the [Union Central] Company to any change in or amendment of the policy without the consent of any employee." Finally, the policy states that Union Central "will not be deemed to be a party to said [pension] plan or agreement in issuing this policy * * * and the [Union Central] Company's obligations are limited to the provisions of this policy." Thus, by the various agreements before us, the union gave Hamilton the right to fund the pension plan in any manner it chose and it chose a policy which limited Union Central's obligations to the provisions of the policy and reserved the sole right to alter the policy to Hamilton and Union Central. Accordingly, without the consent of Union Central, no one, particularly the union representatives, has any right to alter the policy.
 
 
 17
 Thus we must accept the literal and clear requirement of the policy that in order to qualify for retirement benefits an employee must have 15 years of service and have attained the age of 65. Under this literal reading there is no justification for awarding retirement benefits to the 25 long-term employees nor to any other Class C and Class D employees.
 
 
 18
 This, however, is not to say that the employees are entitled to no benefits under the policy. Both the Trustee and the union representatives have based their argument solely on the provisions of the policy dealing with retirement benefits and have maintained that unless and until an employee meets the retirement requirements, as they "interpret" them, he is entitled to no benefits under the policy.
 
 
 19
 However, largely ignored by the Trustee and the union representatives is the fact that the policy contains a distinct section, Section I, covering "DISCONTINUANCE OF THIS POLICY." We find in this section, clear indication of a situation other than retirement which entitles employees to benefits under the policy.
 
 
 20
 The union representatives make much of their contention that the annuity policy must be interpreted in pari materia with the collective bargaining agreement and the pension plan.
 
 
 21
 At the time this matter was first before this court, Judge Cummings noted, "None of the parties has contended that the policy is ambiguous and must be construed by reference to the pension agreement." Union Central Life Ins. Co. v. Hamilton Steel Products, supra, 374 F.2d at 821. We are not persuaded now that there is any ambiguity. However, even if resort to other documents were necessary, see Connecticut General Life Ins. Co. v. Craton, 405 F.2d 41, 48 (5th Cir. 1968), it would not avail the union representatives here.
 
 
 22
 In deference to their argument, we have examined the collective bargaining agreement and the pension plan, and particularly the provisions emphasized by the union representatives, and find that they have nothing to say concerning the present situation. They were, as might be expected, drafted on the assumption that the employer would continue in existence funding the pension plan in perpetuity. Thus they speak only to the requirements for retirement benefits and say nothing about the disposition of the fund in the event the pension plan is totally discontinued. That, however, is the present situation and only the annuity policy contains any provisions indicating what the parties intended should happen to the fund under such circumstances.
 
 
 23
 We have concluded that, under the discontinuance provisions of the policy, benefits are to be awarded to all persons covered by the policy at its discontinuance — i. e., all persons employed by Hamilton (Section A 1) who are members of the Steelworkers (Section B 3). The discontinuance provisions indicate both an intent to create a discontinuance benefit distinct from the normal retirement benefit and an intent that all employees covered by the policy at its discontinuance share in that benefit.
 
 
 24
 As to the intent to create a distinct discontinuance benefit, Section I several times indicates that a possible effect of the discontinuance of the policy is the purchase of "vested deferred annuities" for qualified individuals. These are obviously something different than the simple "annuity" called for in sections dealing with normal retirement benefits. Under Section J 4 of the policy, these deferred annuities "mature upon the employee's normal retirement, * * * whether or not he is then in the service of this Employer and whether or not he retires at that time." This, of course, can mean nothing but that the parties contemplate a benefit which vests prior to normal retirement and vests despite the employee's failure to meet the requirements for the normal retirement benefit.
 
 
 25
 Section I also indicates a clear intent that all employees covered by the policy at the time of its discontinuance should be entitled to a discontinuance benefit. Section I 4 deals with the effect of possible amendments to the policy which would eliminate some classes of employees from its coverage — i. e., partial discontinuance. It provides that such excluded employees are entitled to a share of the total fund deposited under the policy which bears "the same relation to the balance in the deposit fund * * * that the discontinued benefits * * * bears [sic] to the benefits of all employees then covered. * * *" Thus, whenever an employee's right to the possibility of a retirement benefit is discontinued by a change in the coverage of the policy, a discontinuance benefit based upon the lost retirement benefit is to be substituted for it even though he has not qualified for the retirement benefit.
 
 
 26
 Section I 2 deals with the effect of the total discontinuance of the policy and again indicates an intent that a discontinuance benefit replace the lost possibility of a retirement benefit for all employees affected by the discontinuance. Section I 2 provides three alternate methods which Hamilton might choose for disposing of any funds on deposit under the policy at its discontinuance.
 
 
 27
 Under the first method, the fund might be paid over to another insurance carrier or trustee if the policy were replaced by new benefits. (Section I 2(a)). Since Section I 4 specifically deals with the situation of changes in coverage excluding previously covered employees, it must be assumed that the coverage of the new benefit referred to in Section I 2 would be co-extensive with the coverage under the discontinued policy so that all covered employees would share in it.
 
 
 28
 A second possible disposition of the fund upon discontinuance of the policy is "suspension." (Section I 2(c)). Section I 3 provides that if the fund is "suspended," Hamilton has three years to reinstate the policy or to direct Union Central that the fund should "be applied to purchase vested deferred annuities." If Hamilton did neither, and it did neither here, the fund "will automatically be applied to purchase such vested deferred annuities." The section goes on to provide that such deferred annuities "will be purchased only for those employees who are covered under this policy upon the date of discontinuance * * *," indicating by negative implication that all employees who are covered at the time of discontinuance are entitled to discontinuance benefits in the form of deferred annuities.
 
 
 29
 The final method of disposing of the fund upon discontinuance is "to purchase vested deferred annuities in the manner set forth in Sections J 3 and J 4." (Section I 2(b)). Section J 3 provides that upon either termination of employment or discontinuance of the policy, "If * * benefits are vested as provided in Section J 5, a paid-up deferred annuity will be purchased in accordance with J 4 * *," but "not vested benefits will be terminated without any value accruing to the employee."
 
 
 30
 Section J 5 then provides that "all of the benefits under this Group Policy will vest upon the purchase of deferred annuities following the discontinuance thereof as provided in Section I."[1] We note the general intent of the parties to the policy found manifest in previously discussed provisions of Section I that all employees whose hope for retirement benefits is extinguished by a premature discontinuance of the policy are entitled to a discontinuance benefit based upon the lost possibility of a retirement benefit. This same general intent appears in Section J 4 dealing with the method of determining and purchasing deferred annuities. It provides that if upon discontinuance the fund is insufficient to purchase an appropriate deferred annuity "for each employee," then the annuity purchased "for each employee" is to be reduced proportionately.
 
 
 31
 Based upon these indications of the intent of the parties to the policy, we conclude that upon discontinuance of the policy, the deposited fund must be applied to purchase a deferred annuity for each employee covered at the time of the discontinuance and that upon such purchase the right of each employee to the discontinuance benefit represented by the deferred annuity vests.[2]
 
 
 32
 Based upon this interpretation of the annuity policy, all members of Class C are entitled to a discontinuance benefit. As employees of Hamilton and members of the Steelworkers, they were covered by the policy when it was discontinued and thus meet the requirements for discontinuance benefits.
 
 
 33
 The situation with respect to the Class D employees is less clear. Since their employment with Hamilton was terminated prior to December 15, 1964, when the required annual payment came due and the policy was technically defaulted, it could be argued that they have not met the requirements for a discontinuance benefit. However, it is our conclusion that they, too, are entitled to such a benefit.
 
 
 34
 Although it has not been urged by the Class D representatives, it appears to us that the termination of employment of the Class D members prior to December 15, 1964, was not such a termination as to take those class members out of the term "employee" as defined by the annuity policy. Since the mass termination was based on economic factors, it was in the nature of a layoff rather than a permanent dismissal for cause. The policy recognizes that such a separation does not defeat an employee's rights under it. Section H 5 provides:
 
 
 35
 "If an employee is laid off and his salary is temporarily suspended because of disability, induction into the armed forces, leave of absence, or other cause, such employee may be considered as continuously employed notwithstanding such suspense of salary."
 
 
 36
 Section B 4(5), echoing the collective bargaining agreement, provides six specific situations in which an employee's length of "continuous service" will be considered terminated for purposes of calculating his benefits under the policy. Noticeably absent is any reference to an economic layoff.
 
 
 37
 While the particular economic layoff involved here may, with the aid of hindsight, seem permanent, this does not alter our conclusion. The policy does appear to recognize the possibility of a permanent economic layoff as the basis for termination of benefits. However, benefits are terminated only after an employee fails to work for the employer for a period of 24 consecutive months. (Section B 4(5) (f)). Here the technical discontinuance of the policy occurred a matter of weeks following the layoff of the Class D employees, and at a time, therefore, while they were still "employees" within the meaning of the policy. Hence, they meet the policy requirements for the discontinuance benefit and are entitled to share in the fund.
 
 
 38
 Our conclusion in this respect is supported not only by the terms of the policy, but by equitable considerations as well. It is commonly accepted that fringe benefits in general, and retirement income plans in particular, represent compensation to the employee for his labors. Even though technically they may not be "wages," they are earned as much as the employee's "take home" and his right to such deferred compensation should not be lightly defaulted.
 
 
 39
 Here the parties to the policy have shown a clear general intent to protect the employee's right to the deferred fruits of his labor in situations other than isolated terminations of employees. We are convinced that had they expressly addressed themselves to the problem of the permanent layoff of all employees during a brief period and the discontinuance of the policy due to the employer's financial collapse, they would not have drawn artificial lines based upon whether an employee was laid off before or after the inevitable default of the policy.
 
 
 40
 Any such line drawing would be artificial indeed in the instant case. No one contests the fact that the Class D employees were dismissed shortly before the technical default and as a result of the same financial breakdown that produced such default. But for the fact that the policy payment happened to fall due a few weeks later rather than sooner, they would have been in exactly the same position as the Class C employees. It appears clear that by the time Hamilton began laying off Class D employees, it could not have made the policy payment no matter what the precise due date.
 
 
 41
 Thus, we conclude that all members of Class C and all members of Class D are entitled to share in the fund remaining on deposit under the annuity policy. Determination of the precise share of each employee must await a remand of this case. Section J 4 of the policy provides that the amount of an employee's deferred annuity is to be calculated by the same formula used to calculate retirement benefits.
 
 
 42
 That formula, contained in Section B 4, obviously cannot be applied according to its exact provisions to the calculation of discontinuance benefits and the district court on remand will thus be faced with the task of formulating an equitable accommodation of all parties' interests. We note only that the Section B 4 formula appears to have as its controlling principles the average monthly earnings of each employee and the length of his service. Thus, it would seem that the 25 long-term employees to whom the district court awarded the entire fund will still receive the major portion of it while Class D employees will no doubt have comparatively small shares. However, the minimal share due some employees does not detract from the right of each employee to receive his just share based on his lost interest in the retirement program.
 
 
 43
 Other issues presented by the parties, including the propriety of the basis for the district court's prior calculation of employee's interests, have been considered but do not warrant discussion in light of our decision and the necessity for a new calculation of the benefits due each employee.
 
 
 44
 Hopefully with the guidelines laid down herein, the fund involved which admittedly was payable to some person or persons in 1964, all of whom are parties to these proceedings, and which has been the source of three trips to this court, may now be expeditiously distributed to the recipients entitled thereto and this matter put to a final rest.
 
 
 45
 The decision of the district court is reversed and the cause is remanded for further proceedings not inconsistent herewith.
 
 
 46
 Reversed and remanded.
 
 
 
 Notes:
 
 
 [1]
 Section J 5 contains two further sentences, both of which we have concluded deal with the termination of employment situation referred to in Section J 3 rather than the discontinuance situation with which we are here concerned and which is also referred to in Section J 3. The second sentence of Section J 5 states thatprior to discontinuance benefits vest only upon the purchase of an annuity for an employee upon his retirement. The third sentence, which we find refers back to the second covering only situations "prior to discontinuance," states that there are no circumstances under which benefits vest prior to an employee's retirement.
 
 
 [2]
 Our conclusion presupposes the facts, present here, that the fund has not been paid into a substituted benefit for all employees pursuant to Section I 2(a) and that the policy has not been reinstated pursuant to Section I 3(a)
 Further, we note that in the instant case all parties, by stipulation and order of the trial court, have waived the requirement that annuities be purchased as provided by the policy and agree that cash payments will be made to satisfy claims for any benefits found to be owing under the policy.