*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 06a0168p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

BRIAN M. KOLKOWSKI,

         *Plaintiff-Appellant,*

    *v.*

GOODRICH CORPORATION,

         *Defendant-Appellee.*

No. 05-3339

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 02-01216—Kathleen McDonald O'Malley, District Judge.

Submitted: November 30, 2005

Decided and Filed: May 18, 2006

Before: SILER and GRIFFIN, Circuit Judges; TARNOW, District Judge.[*]

_____

## COUNSEL

**ON BRIEF:** Kenneth B. Stark, DUVIN, CAHN & HUTTON, Cleveland, Ohio, for Appellee. Brian M. Kolkowski, Leroy, Ohio, pro se.

_____

## OPINION

_____

ARTHUR J. TARNOW, District Judge. This case involves a dispute between plaintiff Kolkowski and defendant Goodrich Corporation concerning severance benefits. Kolkowski contends he is owed money under the company's Employee Protection Plan ("EPP"), because he was not offered comparable employee benefits by the acquiring company. The district court ruled that Kolkowski was entitled to vacation benefits,[1] but not severance benefits. The district court's denial was based on finding that the plan was covered by ERISA[2] and the application of federal law.

---

[*] The Honorable Arthur J. Tarnow, United States District Judge for the Eastern District of Michigan, sitting by designation.

[1] This part of the judgment was satisfied by the defendant and is not the subject of this appeal.

[2] Employee Retirement Income Act of 1974, 29 U.S.C. §§ 1001-1461.

Kolkowski appeals from this part of the decision.  He argues that the district court's ruling that federal and not Ohio law applies was based on the district court's application of the wrong test.  Further Kolkowski argues even under federal law he should have been awarded benefits.

For the reasons that follow the decision of the district court granting partial summary judgment in favor of Goodrich is reversed and remanded.

### *FACTS*

In late 1997, Kolkowski received an offer of employment from Goodrich.  Within months, Kolkowski joined the company as Patent Counsel.  In addition to a salary and signing bonus, Kolkowski became eligible to join three select bonus programs, as well as the company's Stock Option Plan and the Employee Protection Plan ("EPP").  The EPP provided severance benefits to those who incurred "involuntary termination" within two years of a change in control in the company itself or a division of the company.  The language of the EPP that is at the heart of the dispute, section 5(a), states:

> Termination of the Covered Employee's employment with the Company without consent of the Covered Employee, for any reason other than cause... [I]f the purchaser of any business unit, division, or subsidiary of the Company which is sold after the date on which a Change in Control occurs offers employment to any Covered Employee, the termination of such Covered Employee's employment by the Company prior to or simultaneous with any such sale shall not be considered Involuntary Termination, unless either (1) the base salary offered to the Covered Employee by the purchaser is lower than the Covered Employee's highest base salary between the date immediately prior to the Change in Control and the date of sale, or (2) the employee benefits offered to the Covered Employee are not at least comparable to the benefits received immediately prior to the Change in Control. If either or both of the events described in the foregoing sentence occur, a Covered Employee will be deemed to have incurred an Involuntary Termination if such Covered Employee chooses not to accept the offer of employment made by such purchaser, or accepts the offer of employment, but voluntary terminates within sixty days following such event.

In April of 1999 a change of control took place, Goodrich shareholders approved a merger of their Performance Materials Segment ("PMS") division, the division that employed Kolkowski, with Coltec Industries.  The approved merger transferred ownership of the two divisions to a group of investors named PMD Group ("PMD").

In anticipation of the date of sale, in early 2001, Goodrich distributed a newsletter entitled "PM Newsline" to all the employees of their PMS division, notifying them that they would cease being Goodrich employees on the closing date of sale, February 28, 2001.  The newsletter also supplied the PMS employees with general information about their future employment opportunities with PMD.  According to the newsletter, every employee would be offered the same base salary, the same bonus opportunities, the same time off policies for 2001, essentially the same health and welfare benefits, and the same severance program through April 9, 2001.  The newsletter also stated that it would adopt a new severance program after the April 2001 date.  This particular program was later finalized and became known as the Performance Materials Transition Arrangements Plan.  The PM newsletter did not discuss the specifics of the bonus or benefits plans, nor did it discuss the availability of stock option plans to employees.

Kolkowski, who was entitled to discretionary stock option benefits while employed at Goodrich, became concerned with the lack of specificity in PMD's employment offer.  He attempted to discuss this with Goodrich's administrator of the EPP but was unable to even determine who the

plan administrator was. Instead, Kolkowski met with Terrence Linnert, the head of the legal department and human resources at Goodrich. Linnert was also unsure of PMD's employment offer but reminded Kolkowski that the EPP's provision allowed him to reject an employment offer if the position did not include at least the same salary and comparable benefits. At no time during the conversation did Linnert inform Kolkowski that the offer was substantially comparable.

On February 22, 2001, Kolkowski received a more specific offer of employment from PMD's Human Resources head, Cheryl Fells. The offer included the same position, same base salary, the eligibility to participate in a pension plan and 401(k) plan, the unspecific opportunity to receive substantially comparable performance based cash incentives, and

> employee welfare and other benefits (*e.g.* medical, dental, vision, life insurance, disability and accidental death and dismemberment insurance) that are substantially equivalent to the benefits provided to you by The B.F. Goodrich Company immediately before close.

The letter did not mention a stock option plan or a change in control severance protection agreement.

The next day, Kolkowski, unsatisfied with the specifics of the benefits outlined in PMD's offer, contacted Vice President Chris Clegg of the legal department for PMD. Clegg informed Kolkowski that he could not answer any questions but directed him to e-mail Fells with any specific questions, which he promptly did.

On February 27, 2001, one day before the close of sale, PMD's representative Fells finally responded to Kolkowski's email. She stated the details of the "substantially comparable bonus plan" would be available within the next sixty days, far later than the close of sale. On the same day, Kolkowski received a letter from Goodrich's General Counsel, Linnert, indicating that he would be terminated from Goodrich on the following day.

The next day, Goodrich completed the sale of its PMS division to PMD. Believing that he was not offered substantially comparable benefits, Kolkowski declined PMD's employment offer. He was subsequently discharged by Goodrich.

After waiting over fifteen days after the close of sale for his severance package from Goodrich, Kolkowski sent a letter to Linnert demanding his severance package. Neither Linnert nor Goodrich responded. Over the span of three weeks, three subsequent letters mailed by Kolkowksi were also met with silence. On April 23, Kolkowski sent a final letter to Linnert, this time threatening legal action.

Four days later, senior counsel for Goodrich, Kevin Murphy, responded to Kolkowski's letters and demand for severance. The letter indicated that Linnert was on medical leave and that he was asked by Murphy to respond to Kolkowski's inquiries. Murphy stated that Kolkowski was offered employment that met the requirements of Section 5(a) of the EPP. He continued, "[a]s was explained to you prior to the date that PM was sold, you are not eligible for severance under EPP."

### *PROCEDURAL HISTORY*

Kolkowski filed a complaint against Goodrich in the Court of Common Pleas in Cuyahoga County, Ohio alleging breach of contract arising from the company's failure to disperse severance benefits and vacation pay. The case was removed to the Northern District of Ohio. Cross motions for summary judgment were filed.

The district court issued an order granting partial summary judgment to both sides. The district court found that Kolkowski was entitled to his contractual vacation pay claims, which is not

at issue here. The district court granted Goodrich's motion for summary judgment affirming its denial of severance to Kolkowski.

In arriving at its decision to affirm the denial of severance benefits, the district court determined that the severance benefits plan was an ERISA benefits plan, governed by federal law. Applying ERISA law, the district court then conducted *de novo* review of the denial of benefits looking first to the plan's plain language. After determining that the plan's language was ambiguous, the district court next turned to the materials that the plan administrator used to make his decision. The district court, noting that the case was difficult, determined that Kolkowski had been offered at least comparable benefits to those he received at Goodrich. Thus, the district court upheld the plan administrator's denial of severance benefits.

Kolkowski appeals this ruling.

### STANDARD OF REVIEW

Kolkowski asks this Court to review the district court's order granting defendant's motion for summary judgment. We review *de novo* the grant of summary judgment, using the same Rule 56(c) standard used by the district court, *Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999)(*en banc*)(*citations omitted*), and considering the record as it stood before the district court at the time of its ruling. *Nieco v. Emro Marketing Co.*, 973 F.2d 1296, 1303 (6th Cir. 1992). Similarly, we review the decision to deny benefits under ERISA *de novo*, unless the plan expressly commits discretion to determine eligibility and to construe the terms of the plan to the plan administrator. *Wilkins v. Baptist Healthcare Sys.*, 150 F.3d 609, 616 (6th Cir. 1998). Both sides agree that the EPP grants no such discretion, therefore this Court's review of the plan administrator's decision is *de novo*.

### IS THE EPP AN ERISA BENEFIT PLAN?

Appellant argues that the district court erred in its conclusion that the EPP should be categorized as an ERISA benefit plan. If the benefits plan does not fall under ERISA governance, Ohio law would govern.

Determining the existence of an ERISA plan is a question of fact to be answered in light of all the surrounding circumstances and facts from the point of view of a reasonable person, which is reviewed for clear error. *Thompson v. Am. Home Assurance Co.*, 95 F.3d 429, 434 (6th Cir. 1996). Thus, the district court's decision that the severance benefit plan is an ERISA benefit plan is reviewed under the clearly erroneous standard.

ERISA defines an employee benefit welfare plan as "any plan... established or maintained by an employer, for the purposes of providing for its participants... (A) benefits in the event of... unemployment... or (B) any benefit described in section 186(c) of this title." 29 U.S.C. § 1002(1). Since severance plans are included in the definition of 29 U.S.C. § 1002(1)(B) they may be considered an ERISA benefits plan. *Cassidy v. Akzo Nobel Salt, Inc.*, 308 F.3d 613, 615 (6th Cir. 2002). Even though "plans to pay employees severance benefits, which are payable only upon termination of employment, are employee welfare benefit plans," *Massachusetts v. Morash*, 490 U.S. 107, 116 (1989), "this circuit has held that not all severance pay plans are ERISA plans." *Cassidy*, 308 F.3d at 616; *see Sherrod v. General Motors Corp.*, 33 F.3d 636, 638-9 (6th Cir. 1994)(severance plan in which benefits were predetermined and involved simple mechanical determination was found not to be an ERISA plan).

In order to distinguish an ERISA from a non-ERISA plan, we must look to the nature of the plan itself. *Cassidy*, 308 F.3d at 616 (citing *Swinney v. General Motor Corp.*, 46 F.3d 512, 517 (6th Cir. 1995)). "The hallmark of an ERISA benefit plan is that it requires 'an ongoing administrative

program to meet the employer's obligation.'" *Swinney*, 46 F.3d at 517 (quoting *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1 at 11 (1987)). Although the *Thompson* three part test is normally used to determine if there is an ERISA benefits plan,[3] this Circuit has used two particular factors to determine if a severance agreement plan meets the *Fort Halifax* criteria to determine if ERISA governs: 1) whether the employer has discretion over the distribution of benefits, and 2) whether there are on-going demands on an employer's assets.

> The degree of discretion retained by the employer over distribution of benefits is one important factor in deciding whether a severance plan is an ERISA plan. …  Another important factor is whether the delivery of benefits creates an on-going demand on employer assets.

*Cassidy*, 308 F.3d at 614.

This Court has said that this determining characteristic of administrator discretion was whether the plan administrator made individualized determinations of eligibility, as opposed to those that require automatic or simple decisions.

> [P]lans in which benefits are predetermined or which involve simple or mechanical determinations have been found not to be ERISA plans...  On the other hand, if to determine benefits the employer must analyze each employee's particular circumstances in light of the appropriate criteria, the severance plan is probably an ERISA plan.

*Cassidy*, 308 F.3d at 614 (citing *Sherrod*, 33 F.3d at 638-39.).

In this case, the plan administrator exercised discretion in determining benefits in two distinct ways, one more complex than the other.  The administrator decided whether the benefits offered by an acquiring company were "at least comparable" to the prior benefits.  The administrator also computed the seniority status of each employee in order to calculate the amount of severance pay and benefits due.  The administrator's authority to evaluate and determine facts, including whether an employee's prior and prospective position have "at least comparable" benefits, is more than the simple, mechanical function that the Court encountered in *Sherrod*.  Under similar facts, the Ninth Circuit in *Bogue v. Ampex Corp. and Allied Signal Inc.*, 976 F.2d 1319, 1326 (1992), found the severance package at issue to be an ERISA severance benefit plan since it required the company to determine whether an employee received "substantially equivalent employment" to trigger the severance benefits.

> The ongoing benefits prong is self-explanatory,

> [a] plan may be an ERISA plan if the employer "assumes . . . responsibility to pay benefits on a regular basis, and thus faces . . . periodic demands on its assets that create a need for financial coordination and control."

*Cassidy*, 308 F.3d at 613 (quoting *Fort Halifax*, 482 U.S. at 12).

---

[3]The *Thompson* three part tests asks: 1) determine whether the Department of Labor's "safe harbor regulations apply"; 2) look to the surrounding circumstances whether a reasonable person could ascertain the intended benefits, the class of beneficiaries, the source of financing, and the procedures for receiving benefits; and 3) whether the employer has established or maintained a plan with the intent of providing benefits to its employees.  95 F.3d at 434-35.  The first and third parts of this test are easily met in this case and therefore not discussed, the second part is discussed below.

Despite the fact that the EPP issued a one time lump payment of salary and bonuses to those who were eligible, Goodrich's plan also met the requirement of ongoing benefits prong since the medical, dental and life insurance benefits continued for a period after the payout. At least one district court has found this factor was enough for the plan to be considered an ERISA plan. *See Champagne v. Revco*, 997 F.Supp. 220, 225 (D.R.I. 1998)(severance benefits plan for employees displaced after merger, which provided for lump sum severance payment, was nevertheless an employee welfare benefit plan subject to ERISA because continuing medical benefits and outplacement assistance provided by plan created ongoing obligations for employer). Secondly, the EPP covered every involuntary termination over a two-year period.

Plaintiff argues that the district court and Defendant's reliance on this line of cases is misplaced. Claiming it is better suited to determine whether a plan constitutes an ERISA plan, Plaintiff asks us to substitute the test set forth in *Donovan v. Dillingham*, 688 F.2d 1367 (11th Cir. 1982). Under *Dillingham*, "a plan, fund or program under ERISA is established if, from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits," *i.e.*, the second part of the *Thompson* three part test. Plaintiff argues that under this test the EPP would fail to be considered an ERISA plan since Goodrich did not comply with ERISA's reporting requirements, there was admittedly no plan administrator at times, and no claims procedure was in place.

Even though "the *Dillingham* test has been adopted by this court... as well as every other circuit," *Williams v. WCI Steel Comp.*, 170 F.3d 598, 603 fn. 3 (6th Cir. 1999)(*citations omitted*), this Court has not always employed this test when determining whether an ERISA plan exists in severance package cases. *See Cassidy*, 308 F.3d at 616; *Shahid*, 76 F.3d at 1409; *Swinney*, 46 F.3d. at 517. The only case that has mentioned the *Dillingham* test in a severance package case to come after the *Sherrod* and *Shahid* decisions is *Reedstrom v. Nova Chemicals, Inc.*, 96 Fed. Apx 331 (6th Cir. 2004)(*unpublished*). In that case, only after the court employed the *Sherrod* factors to determine that the severance package qualified as an ERISA plan, did the court then conclude that appellant's *Dillingham* argument was insufficient because severance payments could be calculated, the class of beneficiaries had been defined, and the procedures were spelled out.

Similar to *Reedstrom*, the EPP in this case also meets the requirements of the *Dillingham* test since the intended benefits (twelve months salary, unused vacation, bonuses, and welfare benefits), the intended beneficiaries (employees who are involuntarily terminated), the procedures for obtaining the benefits (automatic receipt within 15 days after termination), and the source of the financing (Goodrich) are not difficult for a reasonable person to ascertain. These tests are not exclusive of each other but instead are different tools that can both be used to determine whether an ERISA plan exists.

Thus, under either test the EPP qualifies as an ERISA plan and it cannot be said that the district court clearly erred in making its determination that the EPP constituted an ERISA plan.

### *APPELLATE REVIEW OF DENIAL OF ERISA BENEFITS*

Kolkowski argues the district court erred by affirming the plan administrator's decision to deny him severance benefits under ERISA law. Specifically, Kolkowski argues that PMD's employment offer did not include "comparable benefits" to the benefits that he received at Goodrich, such as a stock option plan, a specific performance based incentive plan, and a change in control severance protection agreement.

Both parties agree that the plan administrator was not invested with discretionary authority to interpret the meaning of the plan. In such cases, review of the plan administrator's decision by the district court, as well as the appellate court, is *de novo* with respect to both the plan

administrator's interpretation of the plan and the plan administrator's factual findings. *Wilkens*, 150 F.3d at 613.

We construe an ERISA plan with a view toward effectuating its general purpose. *See Wulf v. Quantum Chemical Corp.*, 26 F.3d 1368, 1374 (6th Cir. 1994). We thus begin our "review with the language of the Plan, the starting point for interpreting any written instrument." *Id.* The most important consideration in construing a plan "is the language of the plan itself as known by the employees, or as the employees should have known." *Callahan v. Rouge Steel Co.,* 941 F.2d 456, 460 (6th Cir. 1991). However, where the terms of a plan are ambiguous, we look to extrinsic evidence to discern the purpose of the plan as the average employee would have reasonably understood it.

Here, the terms "employee" and "employee benefits" are used interchangeably throughout the Plan. We believe they are ambiguous terms. The plain language of the EPP does not define the term "employee benefits." Kolkowski contends that stock options are ordinarily understood to be contained within the meaning of the term "employee benefits." Therefore, the fact that the EPP does not spell out what is meant by the terms should not matter.

Goodrich, on the other hand, points to two sections within the EPP to support its position that the term "employee benefits" does not contemplate stock option plans. Instead, Goodrich argues, stock options are better categorized as compensation. Section Six of the EPP entitled "Employee Protection Benefits" addresses the continuation of health and welfare benefits, but fails to mention the continuation of stock options or equity benefits.

The district court opinion noted that the only reference to stock options in the EPP is under Section Seven, entitled "Payment Limitations," which refers to stock options as compensation.

> For the purposes of this section, compensation shall include every type and form of compensation includible in gross income in respect of employment by the Company, including compensation income recognized as a result of the exercise of stock options or sale of the stock so acquired and long-term incentive payments.

Whether the language of the plan is ambiguous is a question of law requiring *de novo* review. *Wulf*, 26 F.3d at 1376. The district court determined that the EPP term "employee benefits" was ambiguous, *i.e.* subject to two reasonable interpretations. *Id*. This Court agrees that the parties have both offered plausible interpretations of the EPP's language and that the EPP itself lacks conclusive evidence for either interpretation. Although the language in Sections Six and Seven suggests the exclusion of stock options from the definition of "employee benefits," Kolkowski's commonly understood interpretation of the terms contained in a separate section is also still entirely reasonable. As a result, the terms "employee benefits" in the EPP are ambiguous which forces this Court to look outside the plan.

This Court must next look to a subset of extrinsic evidence, "confined to evidence that was included in the record upon which the administrator based its decision." *Id.* In determining whether Goodrich's stock option plan should be considered an "employee benefit" within the scope of the EPP, significant weight is given to Goodrich's communications with its employees since this would have aided them in their understanding of the term "employee benefits."

The other materials before the plan administrator were the EPP summary, the PM Newsline, the Performance Materials Transition Arrangements Plan, the Employment Termination Protection Plan, the offer of employment, Kolkowski's letter to Linnert, the denial letter and Murphy's institutional knowledge provided in the form of an affidavit.

At least one document was produced and distributed by Goodrich to its employees in order to aid in their understanding of the complex EPP provisions. In response to Kolkowski's interrogatory which requested "any and all documents related to or referring to the interpretation of the contract language in the Defendant's Employee Protection Plan...," Goodrich submitted the final page of what appears to be a three page summary of the EPP. This is precisely the type of evidence that allows a court to determine how the average plan participant would have understood the terms of the EPP. It stated in relevant part:

> The benefits provided by the plan are in lieu of the benefits to which a covered employee would otherwise be entitled under any severance pay plan or policy of the Company. However, the plan's benefits are in addition to, and do not affect, any other benefits to which a covered employee may be entitled, such as benefits under the pension, stock purchase and savings, stock option or other plans.

The summary of the EPP is clear. Stock option plans are to be considered a type of benefit. The average plan participant's interpretation of the EPP with the aid of its summary would include the belief that equity benefits are included within the EPP's definition of "employee benefits."

The district court was unconvinced that the summary's description of benefits included the stock option plan in part because Kolkowski submitted only the final page of the presumably three page summary. However, this is not Kolkowski's fault, as he explains in his brief, this was all Goodrich supplied to him.

The district court also made the distinction that the summary refers to the stock option plan as a potential source of benefits, not "employee benefits." The average plan participant would not see any distinction between the two, if there is one.

The district court instead ruled that the stock benefit plan was not considered an "employee benefit" under the EPP. The court based its decision on three reasons: 1) the fact that an offer letter and an employee distributed "Benefits-At-a-Glance" brochure did not mention stock-option plans as an employee benefit; 2) the fact that the stock options were administered by the "compensation" department not the benefits department; and 3) case law that had similarly found stock option plans not to be considered employee benefits because of their discretionary nature. For the reasons below, each of these reasons fail to persuade this Court that the stock option plans were not considered "employee benefits" under the EPP.

The district court rested its decision in part on Kolkowski's 1997 letter offer from Goodrich and a brochure entitled "Benefits At-a-Glance," which was distributed to all Goodrich employees. Both the letter offer and the brochure listed numerous types of benefits offered by Goodrich to both Kolkowski and other Goodrich employees such as, healthcare benefits, life insurance plans, long-term disability insurance, and retirement benefits. Neither the letter offer nor the brochure in its three pages contained any reference to stock options. The district court found these omissions to be significant. However, the pamphlet not only fails to mention stock options, it also fails to list performance based cash incentive plans, an employee benefit that both parties agree are included under the EPP's "employee benefits" term. Moreover, Kolkowski was not offered his stock option plan as a benefit until after almost a year of working for Goodrich. Thus, the letter offer's omission is irrelevant. Therefore, both the brochure and the letter were non-exhaustive lists of "employee benefits" considered under the EPP.

Plan administrator Murphy's affidavit stated that stock options historically had been administered as "compensation" by the Compensation Group, not the Benefits Group. Even if Goodrich internally understood stock option plans were compensation and not employee benefits, it is the court's duty to interpret the plan's language as understood by the average plan participant.

Finally, the district court turned its attention to case law citing three cases that determined that the particular stock option plans were not ERISA pension plans. *See e.g., Oatway v. Am. Int'l Group, Inc.*, 325 F.3d 184, 189 (3d Cir. 2003)(stock option plan was not an ERISA pension plan because options were "discretionary, given in recognition of special service, and awarded in addition to... regular compensation."); *Kaelin v. Tenneco, Inc.*, 28 F.Supp.2d 478, 486-87 (N.D. Ill. 1998)(restricted stock option plan was not an ERISA pension plan); *Lafian v. Electronic Data Sys. Corp.*, 856 F.Supp. 339, 344 (E.D. Mich. 1994)(stock program plan was not an ERISA pension plan). The district court was correct to say that "these cases deal with an issue somewhat distinct from the one before the Court" since the cases involve courts' determinations whether a stock option plan itself qualifies as a pension plan governed by ERISA. These cases are clearly distinguishable from the case at hand. Here, the Court must decide whether Kolkowski received "at least comparable" employee benefits, not whether the stock option plan qualifies under ERISA. The district court went on to say these cases "reveal a general tendency of court to view stock options as part of an employee's compensation package rather than as part of an ERISA plan." Though there may be such a tendency, this Court is required to determine the understanding of the average, Goodrich, plan participant in this instance, not the understanding of the average court's interpretation.

The common understanding of the term "employee benefits" includes stock option plans combined with the fact that Goodrich's own summary of the EPP categorizes stock options as a benefit causes this Court to conclude that stock options were understood by the average plan participant to be included under the EPP's term "employee benefits." Therefore, Kolkowski was not offered employment by PMD that included "at least comparable" benefits to those he previously received while employed at Goodrich. Because Kolkowski was not offered qualifying employment prior to the date of sale, Kolkowski is entitled to severance under the EPP.

This Court does not need to address whether the other benefits at issue were comparable, nor does it need to address whether the plan administrator breached its fiduciary duties to Kolkowski.

For the reasons set forth above, we reverse the summary judgment in favor of Goodrich and remand for the district court to enter summary judgment in favor of Kolkowski, calculate his severance benefits, and award appropriate attorney's fees, if any.