*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0061p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

WILLIAM POLLETT,

*Plaintiff-Appellant,*

No. 05-6459

*v.*

>

RINKER MATERIALS CORPORATION,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 03-00501—John G. Heyburn II, Chief District Judge.

Submitted: September 22, 2006

Decided and Filed: February 13, 2007

Before: SILER, CLAY, and BALDOCK, Circuit Judges.[*]

_____

## COUNSEL

**ON BRIEF:** Louis P. Winner, SEILLER HANDMAKER, Louisville, Kentucky, for Appellant. G. Kennedy Hall, Jr., Augustus S. Herbert, Rebecca Grady Jennings, MIDDLETON REUTLINGER, Louisville, Kentucky, for Appellee.

BALDOCK, J., delivered the opinion of the court, in which SILER, J., joined. CLAY, J. (pp. 4-8), delivered a separate dissenting opinion.

_____

## OPINION

_____

BALDOCK, Circuit Judge. The issue in this appeal is whether an employee, while suspended without pay, was "actively at work" and thus qualified to receive short-term disability benefits under his employer's ERISA plan. The plan administrator said no. The district court also said no and dismissed the action on undisputed facts.[1] We exercise jurisdiction under 28 U.S.C. § 1291. Because the ERISA plan does not provide the administrator discretionary authority to

_____

[*]The Honorable Bobby R. Baldock, Circuit Judge of the United States Court of Appeals for the Tenth Circuit, sitting by designation.

[1]By agreement of the parties, judicial review of this matter is limited to the administrative record below.

1

construe its terms, we review the prior construction of the plan de novo. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Applying this standard, we affirm.

On Wednesday January 29, 2003, Defendant Rinker Materials Corporation suspended Plaintiff William Pollett for three days without pay while Rinker investigated an incident involving a broken conveyor belt and Pollett's alleged failure to properly respond. A year prior, Rinker had suspended Pollett for negligently operating a forklift. On Friday January 31, 2003, Pollett's physician declared Pollett unable to work due to numerous physical ailments. That same day, Pollett notified Rinker he was unable to work and provided Rinker with his physician's written assessment. Following his three day suspension, Pollett reported for work on Monday February 3, 2003. Pollett's supervisor did not allow him to return to work. Instead, the supervisor informed Pollett that Rinker was terminating his employment due to violations of company policy regarding plant safety. Pollett subsequently applied for short term disability benefits under Rinker's ERISA plan.[2]

To qualify for short term disability benefits under the plan, an employee must be "actively at work" when he notifies his employer of a disability. Under the plan, "[a]n employee will be considered actively at work if he was actually at work on the day immediately preceding: . . . an excused leave of absence . . . ." Pollett's argument is simple: A suspension without pay equates with an excused leave of absence. According to Pollett, his suspension thus qualifies him as an active employee because he was at work the day before Rinker suspended him.

While novel, Pollett's argument is unpersuasive. Certainly a suspension and excused leave create an absence from work. But to equate a suspension *without* pay with an excused leave defies common sense. A suspension without pay constitutes a unilateral penalty which an employer imposes upon an employee. In contrast, an excused leave is more akin to a bilateral understanding during which an employer grants an employee permission to be absent from work. During an excused leave, the employee suffers no monetary or other penalty and all employment privileges remain intact.[3] An excused absence connotes a lack of punishment while a suspension implies the exact opposite. Merriam-Webster's online dictionary defines "suspend" as "to debar temporarily especially from a privilege." http://www.m-w.com/ dictionary/suspend. The same dictionary defines "excuse" as "to grant exemption or release." http://www.m-w.com/dictionary/excuse. The plain meaning of the phrase "suspended without pay" denotes Rinker barred Pollett from employment and all its attendant privileges during the period of his suspension.

"In interpreting a plan, the administrator must adhere to the plain meaning of its language as it would be construed by an ordinary person." *Morgan v. SKF USA, Inc.*, 385 F.3d 989, 992 (6th Cir. 2004). We have little difficulty concluding that an ordinary person would *not* view Pollett's suspension without pay as an excused leave of absence under the facts of this case.[4] We see no need to belabor the obvious. The judgment of the district court is–

---

[2] Rinker maintains a self-funded ERISA short-term disability plan that provides up to 70% of an employee's basic weekly earnings on the fifteenth day of continuous disability, for a maximum of 12 weeks.

[3] A suspension *with* pay would present a more difficult case in that an employee under such circumstance would incur no monetary penalty due to his absence from work. *Cf. Smith v. Severn*, 129 F.3d 419, 423 (7th Cir., 1997) (suggesting a suspension from school was akin to an excused absence where the student, although prevented from in-class participation, was permitted to make-up missed work). We need not decide whether a suspension with pay would require a result different than we reach today.

[4] While we in no way intend to imply that Pollett does not suffer serious physical ailments, the question of his disability is simply not before us. Nonetheless, under Pollett's interpretation of the plan, a culpable employee, suspended without pay during an investigation into serious misbehavior and armed with the knowledge his return to work was unlikely, could seek to muster a disability of some sort in order to create an entitlement to benefits. This, of course, would be unacceptable.

AFFIRMED.

_____

**DISSENT**

_____

CLAY, Circuit Judge, dissenting. Relying on speculation and conjecture, and without citing any case law or other authority, the majority concludes that Plaintiff is not eligible for short-term disability benefits pursuant to an employee benefits plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* The majority bases this conclusion on its contention that Plaintiff was not actively employed as required by the ERISA plan because he was suspended at the time of his disability. There is simply no factual or legal basis for the majority's conclusion. In the instant case, I would find that both the policy language and intent underlying the ERISA plan, and the appropriate construction of ambiguous plan terms, compel a finding of eligibility.

Since the majority opinion provides little by way of factual background, a more complete recitation of the facts is appropriate here. On December 29, 2001, Plaintiff started working in Defendant's factory as a plant manager. On January 29, 2003, a conveyer belt which Plaintiff was responsible for supervising malfunctioned and caused $2,000 in damages. On that same day, Plaintiff was reprimanded and suspended for three days pending an investigation of the incident. On January 31, 2003, while suspended, Plaintiff was informed by his physician that he "is not able to work" because "[h]e has coronary artery disease with persistent angina even after bypass surgery." (J.A. 77) That same day, Plaintiff informed Defendant of his condition and "tendered to his supervisor [ ]" pertinent medical documents. (J.A. 79) On February 3, 2003, Plaintiff reported to work, as he was scheduled to do, at which time he was terminated as a result of the investigation conducted during his suspension. Plaintiff thereafter applied for short-term disability benefits, but his application was denied based on Defendant's interpretation of provisions set forth in the ERISA plan.

**A.    Legal Framework**

"ERISA was enacted to promote the interests of employees and their beneficiaries in employee benefit plans, and to protect contractually defined benefits." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 113 (1989) (internal quotation marks and citations omitted); *see also Grindstaff v. Green*, 133 F.3d 416, 429 (6th Cir. 1998). "ERISA was established to protect the continued well-being and security of millions of employees and their dependents by providing minimum standards . . . assuring the equitable character of [pension fund] plans and their financial soundness." *United Metal Prods. Corp. v. Nat'l Bank of Detroit*, 811 F.2d 297, 300-01 (6th Cir. 1987) (internal quotation marks and citation omitted) (alterations in original).

This Court reviews the denial of ERISA benefits "under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co.*, 489 U.S. at 115; *see Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 291 (6th Cir. 2005) ("This Court reviews *de novo* an ERISA plan administrator's denial of benefits where the administrator has no discretion to determine benefits eligibility."); *see also McDonald v. Western-Southern Life Ins. Co.,* 347 F.3d 161, 168 (6th Cir. 2003). The Supreme Court has found that a de novo standard of review affords the appropriate level of protection to employees and their beneficiaries. *See Firestone Tire and Rubber Co.*, 489 U.S. at 114.

In the instant case, "the validity of a claim to benefits under an ERISA plan is likely to turn on the interpretation of terms in the plan at issue." *Id.* at 115. Case law sets forth the proper criteria and guiding principles which this Court employs when reviewing ERISA plan terms. In the instant

case, both "the policy language and intent underlying" the ERISA plan, *Citizens Ins. Co. of Am. v. MidMichigan Health ConnectCare Network Plan*, 449 F.3d 688, 692 (6th Cir. 2006), and the construction of ambiguous plan terms in favor of the insured and strictly against the insurer, *Regents of Univ. of Michigan v. Employees of Agency Rent-A-Car Hosp. Ass'n*, 122 F.3d 336, 339-40 (6th Cir. 1997), compel a finding of eligibility. Both of these bases for finding Plaintiff eligible for short-term disability benefits under the ERISA plan are discussed below.

### 1.        The Policy Language and Intent Underlying the ERISA Plan

#### a.        The Policy Language

This Court "review[s] the employee's claim as it would have any other contract claim[,] by looking to the terms of the plan and other manifestations of the parties' intent." *Firestone Tire and Rubber Co.*, 489 U.S. at 112-13. More specifically, when reviewing a non-discretionary ERISA plan, this Court is charged with "constru[ing] [the] ERISA plan with a view toward effectuating its general purpose." *Kolkowski v. Goodrich Corp.*, 448 F.3d 843, 850 (6th Cir. 2006).

The ERISA plan at issue in this case provides disability coverage for persons who become disabled while on "Active Employment." (J.A. 53) "Active Employment" is defined in the plan as:

> actively at work for [Defendant]
> 1.        on a full time basis and paid regular earnings;
> 2.        for at least the minimum number of hours shown in the Plan
>          Specifications . . .

*Id.* The parties agree that Plaintiff does not qualify under this primary definition. However, the plan provides that:

> [a]n [e]mployee will be considered actively at work if he was
> actually at work on the day **immediately proceeding** . . .
> 1.        a weekend . . .;
> 2.        holidays . . .;
> 3.        paid vacations;
> 4.        any non-scheduled work day;
> 5.        **an excused leave of absence** . . .; and
> 6.        an emergency leave of absence . . . .

*Id.* (emphasis added). The plain does not define what constitutes an "excused leave of absence." *Id.* Since the plan does not define this term, the Court looks at other sources to assist its interpretation of the plan. *Kolkowski*, 448 F.3d at 850 ("where the terms of a plan are ambiguous, we look to extrinsic evidence to discern the purpose of the plan as the average employee would have reasonably understood it.").

According to *Black's Law Dictionary*, a "leave of absence" is "[a] worker's temporary absence from employment or duty with the intention to return." *Black's Law Dictionary* at 901 (7th ed. 1999). Applying the plain meaning of this definition, Plaintiff's employer-ordered suspension simply cannot be distinguished from other employer-authorized leaves of absence.

In the instant case, Plaintiff was suspended for three-days on January 29, 2003. The length of Plaintiff's suspension clearly indicates that his suspension involved only a "temporary absence from employment." *Id.* Indeed, until Defendant actually terminated Plaintiff on February 3, 2003, all parties anticipated Plaintiff's return to work. The record indicates that there was a continuing employer-employee relationship during Plaintiff's three-day absence. For example, Plaintiff reported his disability to a supervisor on January 31, 2003. Plaintiff also returned to work on

February 3, 2003, as he was scheduled to do. "There is a clear distinction between being fired and being temporarily suspended for an investigation, even if that temporary suspension is without pay." *Stencel v. Augat Wiring Sys.*, 173 F. Supp. 2d 669, 680 (E.D. Mich. 2001); *see also Andreu v. Sapp*, 919 F.2d 637, 642 (11th Cir. 1990) (distinguishing between suspension and termination and finding that plaintiff's "suspension was pending an internal investigation. If the department intended to permanently remove [plaintiff], no investigation would be necessary."); *Munno v. Town of Orangetown*, 391 F. Supp. 2d 263, 269 (S.D.N.Y. 2005) (finding that "plaintiff was *suspended* not *terminated*") (emphasis in original)).

In the instant case, the suspension simply did not discharge Plaintiff and did not sever his employment status. Defendant recognized that Plaintiff was still actively employed during his suspension because Plaintiff was not terminated until February 3, 2003, when Plaintiff returned to work. "If the suspension had amounted to a permanent removal, [formally] discharging him would not have been necessary." *Andreu*, 919 F.2d at 642; *see also Irrgang v. Masco Corp.*, No. 01-Civ-6944, 2002 WL 253949, at *1 (E.D.Pa. Feb. 21, 2002) (finding that "plaintiff continue[d] to be employed under suspended status"). Since there was no separation from employment, Plaintiff remained subject to the control of the employer and under employer supervision. Therefore, Plaintiff was still actively employed with Defendant at the onset of his disability. The continuity of Plaintiff's employment status compels a finding that Plaintiff's suspension constituted a leave of absence under the terms of the ERISA plan.

### b.          The Intent Underlying the ERISA Plan

"When interpreting ERISA plan provisions," this Court "ha[s] gone beyond the actual language of the plan . . . to ascertain the underlying intent." *Citizens Ins. Co. of Am.*, 449 F.3d at 693. "In order to decide which [plan] interpretation is correct, [the Court] *must consider both the policy language and the intent underlying the provision.*" *Id.* at 692 (emphasis added); *see also Wulf v. Quantum Chem. Corp.,* 26 F.3d 1368, 1376 (6th Cir.1994). "A technical construction of a policy's language which would defeat a reasonable expectation of coverage is not favored." *Regents of Univ. of Michigan*, 122 F.3d at 339 (citation omitted). Therefore, this Court is charged with reviewing and analyzing the "intent underlying," *Citizens Ins. Co. of Am.*, 449 F.3d at 692, the ERISA plan to determine what constitutes an "excused leave of absence." (J.A. 53) In the instant case, the intent underlying the ERISA plan compels a finding of eligibility for short-term disability benefits.

The ERISA plan sets forth an extensive list of events during which an employee would be eligible for benefits provided that the employee was actually working on the "immediately preceding" day. (J.A. 53) These events, which include "a weekend . . . holidays . . . paid vacations . . . [and] any non-scheduled work day," encompass periods of time during which an employee would not be working, but would still "be considered actively at work." *Id.* The list of qualifying events is an "indication[ ] of the intent of the parties to the policy." *Union Cent. Life Ins. Co. v. Hamilton Steel Prods., Inc.*, 448 F.2d 501, 507 (7th Cir. 1971).

In the instant case, "the parties to the policy have shown a clear general intent to protect the employee's right," by providing coverage for a wide range of events. *Union Cent. Life Ins. Co.*, 448 F.2d at 508. This impression is reinforced by the lack of express limitations to the policy. *See Regents of Univ. of Michigan*, 122 F.3d at 339 ("an insurer has a duty to express clearly the limitations in its policy") (citation omitted). The extensive list of qualifying events compels a finding that Defendant simply "would not have drawn artificial lines" between different qualifying absences. *Union Cent. Life Ins. Co.*, 448 F.2d at 508. Since a suspension cannot be meaningfully distinguished from other events in the extensive list of qualifying absences, there is a "reasonable expectation of coverage" during Plaintiff's suspension. *Regents of Univ. of Michigan*, 122 F.3d at 339 (citation omitted). Therefore, interpreting "leave of absence" as including Plaintiff's suspension

is clearly the most logical reading of the ERISA plan and is consistent with the plan's eligibility terms and underlying intent.

### 2.        The Appropriate Construction of Ambiguous Plan Terms

Without citing any case law or source, the majority improperly construes an ambiguity in the plan terms against Plaintiff, finding that a "leave of absence" should be with pay, voluntary, and non-disciplinary. The majority's approach is simply wrong. When reviewing ambiguous ERISA plan terms, this Court has found that "*any ambiguity will be construed liberally in favor of the insured and strictly against the insurer*," because "an insurer has a duty to express clearly the limitations in its policy." *Regents of Univ. of Michigan*, 122 F.3d at 339 (citation omitted) (emphasis added). "[A]ny ambiguities in the language of the plan [must] be construed strictly against the drafter of the plan." *Id.* at 340. In the instant case, the appropriate construction of a "leave of absence," (J.A. 53), a somewhat ambiguous plan term, compels a finding that Plaintiff is eligible for benefits. Interpreting the term "leave of absence" as including Plaintiff's suspension is the most practical interpretation of the plan because there is no uniform, specific, or precise distinction between a suspension and a leave of absence, and nothing in the ERISA plan requires a "leave of absence" to be with pay, voluntary, or non-disciplinary.

First, the fact that the employer initiated Plaintiff's suspension does not distinguish the suspension from other leaves of absence. Voluntariness cannot be used to distinguish between a suspension and a leave of absence. Nothing in the ERISA plan requires an excused leave of absence to be voluntary as opposed to imposed by the employer. Moreover, a leave of absence may be involuntary. *See, e.g.*, *Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A.*, 12 F.3d 1382, 1386 (6th Cir. 1993) (employer required suspended employee to take a leave of absence). Contrary to the majority's position, since the employer initiated and authorized Plaintiff's absence from the workplace, the suspension should be construed as an "excused leave of absence." (J.A. 53)

Second, whether Plaintiff's suspension was with or without pay is not relevant. Nothing in the ERISA plan requires an excused leave of absence to be with pay. Moreover, a leave of absence may be without pay. A suspension and leave of absence simply cannot be distinguished based on responsibilities, compensation or benefits because the performance of work duties by the employee, remuneration by the employer, and other benefits may be unaffected or discontinued during both actions. *See, e.g.*, *Union Cent. Life Ins. Co.*, 448 F.2d at 508 (finding that employees were continuously employed and thus entitled to benefits under a retirement income plan).

Third, the disciplinary nature of Plaintiff's suspension is not dispositive. Nothing in the ERISA plan requires an excused leave of absence to be non-disciplinary to come within the purview of the plan. In addition, a leave of absence may be disciplinary. *See, e.g.*, *Gray v. Laws*, 51 F.3d 426, 429 (4th Cir. 1995) (employer placed employee on a disciplinary, compulsory leave of absence). Thus, a suspension or a leave of absence could both be instituted for disciplinary purposes. Again, the majority fails to construe this ambiguity in favor of finding eligibility.

Last, the majority fails to recognize the ambiguity inherent in complex business practices. Indeed, employers may use the terms "suspension" or "leave of absence" interchangeably or institute both actions simultaneously. *See, e.g.*, *Pratt v. Brown Mach. Co., a Div. of John Brown, Inc.*, 855 F.2d 1225, 1231 n.7 (6th Cir. 1988) (employer considers a "leave of absence" a suspension); *see also Padilla v. S. Harrison R-II Sch. Dist.*, 181 F.3d 992, 995 (8th Cir. 1999) (employer served letter of suspension placing employee on a leave of absence).

As illustrated above, the majority relies on speculation and conjecture to fit its definition of what constitutes a leave of absence. Instead of construing the plan in Plaintiff's favor, as this Court's case law requires, the majority creates its own criteria for distinguishing between a

suspension and a leave of absence. The criteria is simply not set forth in case law or by the ERISA plan; this Court's case law and precedent sets forth guiding principles for analyzing and interpreting an ERISA plan.

The majority has simply failed in its obligation to analyze "the policy language and intent underlying" the ERISA plan, *Citizens Ins. Co. of Am.*, 449 F.3d at 693, and to construe ambiguities in favor of the insured and strictly against the insurer. *Regents of Univ. of Michigan*, 122 F.3d at 339. The majority's approach clearly contravenes this Circuit's precedents. As discussed above, the policy language and underlying intent of the ERISA plan compel a finding that Plaintiff is eligible for benefits because he was only temporarily absent from the workplace and remained in active employment. The plan's underlying intent raises a clear expectation of coverage during Plaintiff's suspension. Therefore, facts and evidence in the record and the relevant case law compel a finding of eligibility.

I would find that the district court's decision should be reversed and that this Court should remand to the plan administrator for a determination on the merits of Plaintiff's disability claim.