**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 08a0600n.06
Filed: October 6, 2008

**Nos. 07-3102, 07-3211**


**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**


**NATALIE A. HUGHES, duly-appointed
representative of the Estate of Martin J.
Hughes, Jr.,**

  **Plaintiff-Appellant and Cross-Appellee,**

**v.**

**KIMBERLY A. ZURZ, Director, Ohio
Department of Commerce; JOHN B.
REARDON, Superintendent, Division of
Financial Institutions; KENNETH A.
ROBERTS, Acting Deputy Superintendent for
Credit Unions; AMERICAN MUTUAL SHARE
INSURANCE CORPORATION, as purported
Conservator for the United Telephone Credit
Union Inc.,**

  **Defendants-Appellees and Cross-
Appellants.**

**ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF OHIO**

_____/


**BEFORE:    DAUGHTREY, CLAY, and McKEAGUE, Circuit Judges.**


  **CLAY, Circuit Judge.**  Plaintiff Natalie A. Hughes, representative of the estate of Martin

J. Hughes, Jr., appeals the district court's December 22, 2006 judgment granting summary judgment

to Defendants American Mutual Share Insurance Corporation, Inc. ("ASI"), Doug White,[1] Director of the Ohio Department of Commerce, F. Scott O'Donnell, Superintendent of the Division of Financial Institutions, and Kenneth A. Roberts, Acting Deputy Superintendent for Credit Unions. Plaintiff claimed that Defendants violated the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1381, and the Due Process Clause of the United States Constitution by improperly confiscating benefits due Martin J. Hughes, Jr. pursuant to an ERISA benefits plan. Defendants appeal the district court's grant of Plaintiff's motion for summary judgment and motion to dismiss ASI's counterclaim alleging fraud, misappropriation of funds and breach of fiduciary duties. For the reasons stated below, this Court **AFFIRMS** the district court's grant of summary judgment for Defendants on Plaintiff's claims and **DISMISSES AS MOOT** ASI's appeal of the district court's disposition of its counterclaim.

## BACKGROUND

A. **Procedural History**

On January 24, 2005, Carl F. Hughes, the son and legal guardian of Martin J. Hughes, Jr. ("Hughes"), filed a complaint in United States District Court for the Southern District of Ohio on Hughes' behalf.[2] The complaint was brought against Ohio officials Doug White, Director of the

---

[1]Doug White and F. Scott O'Donnell have been replaced as parties in this suit by the current Director of the Ohio Department of Commerce, Kimberly A. Zurz, and the current Superintendent of the Division of Financial Institutions, John B. Reardon.

[2]Hughes subsequently died, and his widow and the administrator of his estate, Natalie A. Hughes, replaced Carl F. Hughes as the plaintiff in this suit.

Ohio Department of Commerce, F. Scott O'Donnell, Superintendent of the Division of Financial Institutions, and Kenneth A. Roberts, Acting Deputy Superintendent for Credit Unions ("State Defendants"). After filing an amended complaint on February 25, 2005, Plaintiff filed a second amended complaint on April 6, 2005, adding as a defendant American Mutual Share Insurance Corporation, Inc. ("ASI"), the appointed conservator for the United Telephone Credit Union, Inc. ("UTCU").

Count I of the second amended complaint requested equitable relief as a result of the State Defendants' violation of Hughes' due process rights by unlawfully confiscating benefits due to Hughes for his years of service as a director and manager of UTCU. Count II of the second amended complaint alleged that Defendants violated the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1381, by improperly confiscating the benefits payable to Hughes pursuant to an ERISA-covered employee benefits plan. Count III alleged that Defendants breached their fiduciary duties under ERISA.

The State Defendants filed an answer on April 9, 2005, and ASI filed an answer along with its counterclaim on April 26, 2005. ASI's counterclaim alleged that Hughes had committed fraud, misappropriated funds, and breached fiduciary duties as the director and secretary/treasurer of UTCU. Plaintiff moved for partial summary judgment on ASI's counterclaim on May 3, 2005, and moved to dismiss ASI's counterclaim on May 13, 2005. Plaintiff argued that ASI was not lawfully appointed as conservator and thus lacked standing to bring claims on UTCU's behalf. On September 23, 2005, the district court granted Plaintiff's motion for partial summary judgment and motion to dismiss ASI's counterclaim.

On April 28, 2006, Defendants filed a joint motion for summary judgment on Counts II and III of Plaintiff's second amended complaint. The State Defendants subsequently filed a motion for summary judgment on Count I of Plaintiff's second amended complaint. In response, Plaintiff filed a motion for partial summary judgment regarding Defendants' affirmative defenses. On December 22, 2006, the district court granted Defendants' motion for summary judgment on Counts II and III and the State Defendants' motion for summary judgment on Count I. The district court also dismissed Plaintiff's motion for partial summary judgment as moot. On January 19, 2007, Plaintiff filed a timely notice of appeal from the district court's grant of summary judgment, and on February 2, 2007, Defendants filed a joint notice of cross-appeal from the district court's dismissal and grant of summary judgment on ASI's counterclaim and from the district court's final judgment.

**B.      Substantive Facts**

Hughes was employed by the Communications Workers of America ("CWA") union from the 1950s until 1987. During his CWA employment, Hughes helped found UTCU for CWA employees. From 1957 to 1987, Hughes served as a member of the board of directors and as the secretary/treasurer of UTCU on an unpaid voluntary basis. Hughes also served as the Manager or Chief Executive Officer of UTCU.

<u>Hughes' Compensation and Benefits</u>

Beginning in 1987, UTCU's board of directors considered paying Hughes a salary. On November 28, 1987, the minutes of a board of directors meeting reflect the passage of a motion regarding Hughes:

> Motion Carried: To approve the salary of Martin J. Hughes as an employee at his current pay level.

(J.A. 572.) Carl Hughes, a member of the board of directors when the 1987 resolution was passed, gave deposition testimony that the term "current pay level" contained in the resolution referred to Hughes' pay level as a Vice President of CWA.[3] According to Carl Hughes, Hughes deferred the salary due to him beginning in 1987 instead of being paid contemporaneously.

The UTCU board of directors passed another resolution regarding Hughes' compensation on January 28, 1989:

> Motion Carried: To set aside earnings to pay salary and benefits for Martin J. Hughes for services rendered on behalf of this Credit Union and to anyone designated by the Board of Directors who may perform similar services.

(J.A. 1360.) Beginning in 1989, an accrued benefits liability was reflected in UTCU's financial records. Robert A. Sorin, a Certified Public Accountant who served on a supervisory audit committee for UTCU, testified when deposed that the accrued benefits liability reflected the payments owed Hughes for deferred salary benefits; however, he also testified that the accrued benefits liability was too small to account for Hughes' salary being deferred each year.[4] The Ohio Division of Financial Institutions ("DFI"), which conducted periodic examinations of UTCU, noted

---

[3] In 1987, Hughes would have earned $74,784 if he had continued working as a CWA Vice-President.

[4] The accrued benefits liability was listed in UTCU's financial records as "Disability Ins. & Other" and later as "Accrued Benefits." For the years for which liability for deferred compensation purportedly was accrued, the amount of this liability was as follows: 1989-$109,306.79, 1990-$233,067.28, 1991-$283,681.21, 1992- $284,761.86, 1993-$288,762.81, 1994- $284,390.60, 1995-$283,289.17, 1996-$280,000. From 1996 to January 2002, the accrued benefits liability remained constant at $280,000.

with disapproval the presence of the accrued benefits in UTCU's financial records. In DFI's November 1990 examination report, the agency stated:

> There are some accounts that cannot be adequately explained to the examiners . . . [A]pproximately $200,000 is being set aside, as a payable (accrued expense) for unspecified future "employee benefits." The Board of Directors should determine what form these benefits will take and so specify in the minutes.

(J.A. 1264.) No indication of UTCU's action in response to this criticism is contained in the record. However, DFI's September 1996 examination report stated:

> The Accrued Benefits account has not changed since the last examination. This account was set up many periods ago for future retirement benefits. It has been reviewed and approved by the Division of Financial Institutions. Management has no intention of increasing this account in the near future.

(J.A. 951.)

On July 24, 1999, UTCU passed another resolution regarding Hughes' benefits. The 1999 resolution affirmed that since November 28, 1987, Hughes "was authorized to receive a salary from [UTCU] equal to the same salary of a Vice President of [CWA], but such authorized salary has not been paid. [UTCU] established a Reserve Account of Accrued Benefits that has been set aside for Martin J. Hughes." (J.A. 574.) The resolution further provided that Hughes would be paid an annual salary of $90,000, "and in the event of his death or disability, payments of four (4) times his present annual salary should be paid his widow, . . ." (J.A. 574.) On August 1, 1999, Hughes entered into an employment agreement with UTCU incorporating the salary provisions of the 1999 resolution and including a death benefit of five times his annual salary ($450,000) and five weeks of annual paid vacation, which could be paid in cash if not taken. The 1999 agreement also provided that Hughes was eligible to participate in pension and retirement programs "now or in the future." (J.A. 581.)

6

### DFI's Imposition of a Conservatorship

DFI took issue with Hughes' employment contract in its 2001 examination of UTCU, viewing the employment agreement as evidence of self-dealing by the board, which consisted of Hughes, his friends, and his family members. DFI also found accounting irregularities, misappropriation of credit union funds, and failure to comply with Internal Revenue Service regulations. As a result, DFI entered into a supervisory agreement on July 18, 2002 with UTCU that required the credit union to take corrective action, including revising Hughes' employment agreement. On July 19, 2002, DFI sent UTCU an examination report in which it instructed the credit union to increase the accrued liability entry in its financial reports to $450,000 to properly reflect UTCU's liability for Hughes' death benefit. On February 24, 2003, Acting Deputy Superintendent of Credit Unions, Kenneth A. Roberts, appointed ASI as the conservator for UTCU because DFI determined that UTCU had failed to abide by the supervisory agreement.[5] As conservator, ASI was ordered to take possession of the business and property of UTCU, exercise the authority of the officers, directors, and members of UTCU, and to bring and defend law suits in the name of UTCU. Soon after ASI took charge of UTCU's affairs, the newly appointed manager of UTCU removed the accrued benefits liability from UTCU's financial statements. UTCU's auditor explained that:

> The Conservator believes that the employment contract is unenforceable due to the DFI's removal action against the former manager and, potentially, for the breach of fiduciary duties by the Credit Union's former Board of Directors in approving the employment contract. Accordingly, the Credit Union does not recognize any obligation under the contract and has not recorded any liability as of May 31, 2003.

---

[5]Roberts was explicitly given the authority to appoint a conservator for UTCU by a February 21, 2003 order of F. Scott O'Donnell, the Superintendent of Financial Institutions.

(J.A. 1409.)

Hughes brought suit on behalf of UTCU in the Franklin County Court of Common Pleas contesting Roberts' authority to appoint ASI as UTCU's conservator. *United Tel. Credit Union v. Roberts*, No. 03-CVH-02-2278 (Franklin Cty. Ct. Comm. Pleas). This suit was subsequently withdrawn. Because of the challenge to Roberts' appointment authority, Superintendent O'Donnell issued an order on July 23, 2003 ratifying Roberts' appointment of ASI as UTCU's conservator. Natalie Hughes brought another suit on behalf of UTCU in the Franklin County Court of Common Pleas challenging Roberts' authority to appoint a conservator, and the trial court ruled in her favor on July 26, 2005. *United Tel. Credit Union, Inc. v. Roberts*, No. 04-CVH-055436 (Franklin Cty. Ct. Comm. Pleas July 26, 2005). Following this ruling, DFI terminated Roberts' original order appointing ASI as UTCU's conservator and issued a second order to the same effect signed by O'Donnell himself. The trial court's judgment was later overruled by the Ohio Court of Appeals, which held that Natalie Hughes did not have the authority to bring suit on behalf of UTCU. *United Tel. Credit Union, Inc. v. Roberts*, Nos. 05AP-827, 05AP-870, 2006 WL 1174507 (Ohio Ct. App. May 4, 2006) (unpublished), *aff'd*, 875 N.E.2d 927 (Ohio 2007).

### Termination of Hughes' Relationship with UTCU and Claims for Benefits

In an effort to transition out of the leadership of UTCU, Hughes approached Sam Rizzo about replacing him as Manager of UTCU. In a memo to Roberts written on July 6, 2002, Rizzo recounted Hughes' assertions that retirement benefits were due to him:

> Mr. Hughes has created a liability on the credit unions [sic] books for approximately $500,000. This sum is intended to pay him $100,000 per year for five (5) years after he retires. When I asked him about this account he told me that that was for the 40

years he served as a volunteer for the credit union.  By definition, he should not be
paid for volunteerism.

(J.A. 1379.)  Martin J. Hughes, III, Hughes' son, also called Roberts and requested that Hughes receive some portion of the deferred compensation Hughes believed was owed to him as a condition for Hughes stepping down from the board of directors.  Roberts refused to consider this option.  In February and May of 2003, Hughes contacted the ASI-appointed manager of UTCU requesting his "paycheck" and his "pension."  (J.A. 1386, 1392.)  Hughes was told to "put his concerns in writing, addressed to the conservator."  (J.A. 1386.)

On May 28, 2003, Roberts ordered Hughes suspended from his roles as a director and officer of UTCU and indicated DFI's intent to remove Hughes from these positions.  Hughes' counsel sent a letter to UTCU's manager requesting Hughes' "retirement entitlement or severance compensation" on June 19, 2003.   On December 2, 2003, the Cuyahoga County Probate Court found Hughes incompetent due to depression, dementia and cognitive impairments.  As a result, Carl Hughes was appointed Hughes' guardian.  On July 29, 2004, Carl Hughes entered into a settlement agreement with DFI consenting to Hughes' removal as an officer and director of UTCU.  On December 1, 2004, Hughes' attorney sent a letter to ASI's counsel requesting Hughes' deferred compensation and death/disability benefits, amounting to $1,941,271.23.

**DISCUSSION**

I.    **ERISA CLAIMS**

A.    **Standard of Review**

This Court reviews a district court's grant of summary judgment *de novo*. *Kolkowski v. Goodrich Corp.*, 448 F.3d 843, 847 (6th Cir. 2006). Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact, and all inferences should be made in favor of the non-moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The moving party may meet its burden by showing "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. In response, the nonmoving party may not simply rely on its pleadings, but instead must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). While all inferences must be drawn in favor of the nonmoving party, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient [to defeat a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

### B.     Analysis

The Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1381, governs employers' administration of employee benefits plans. ERISA defines an employee benefits plan as an employee welfare benefits plan, an employee pension benefits plan, or a plan that is both an employee welfare benefits plan and an employee pension benefits plan. 29 U.S.C. § 1002(3). Included in ERISA's definition of an employee welfare benefits plan is a

plan, fund, or program [that] was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, . . . medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services . . .

29 U.S.C. § 1002(1). An ERISA employee pension benefits plan is a

plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program--
>    (i) provides retirement income to employees, or
>    (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond,
regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan.

29 U.S.C. § 1002(2).

In order to determine whether a plan qualifies as an ERISA employee benefits plan, this Court applies the four-part test first set forth by the Eleventh Circuit Court of Appeals in *Donovan v. Dillingham*, 688 F.2d 1367 (11th Cir. 1982). *See Int'l Resources, Inc. v. New York Life Ins. Co.*, 950 F.2d 294, 297 (6th Cir.1991) (adopting the *Dillingham* test). The *Dillingham* court held that a "'plan, fund, or program' under ERISA is established if from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." *Dillingham*, 688 F.2d at 1372. Both parties agree that the intended beneficiaries of this compensation plan (Hughes) and the source of funding (general funds) are clear. *See Williams v. Wright*, 927 F.2d 1540, 1544-45 (11th Cir. 1991) (holding that plan covering single employee funded by employer's general assets was an employee benefits plan).

However, Defendants contend and the district court agreed that the intended benefits and procedures for receiving benefits are not reasonably ascertainable.

### 1. Intended Benefits

The district court found that the intended benefits of the deferred compensation aspect of the plan were not reasonably ascertainable based on its evaluation of the actions of the UTCU board of directors in 1987, 1989, and 1999 and its evaluation of UTCU's financial statements for the relevant time period. Because the 1987 motion only stated the board's intention to pay Hughes a salary at an undefined "current pay level" and made no mention of the salary being deferred, the district court found that the 1987 motion was insufficient to establish a deferred compensation plan. The court found that the 1989 motion did not cure these defects because it simply memorialized the board's intention to "set aside earnings to pay salary and benefits" without specifying the amount to be set aside or the nature of benefits to be provided to Hughes. The district court also noted that the 1999 motion, although acknowledging that the board had authorized Hughes to receive a salary beginning in 1987, did not explicitly state that salary had been deferred.

In holding that the intended benefits of the deferred compensation plan were not reasonably ascertainable, the district court also relied upon the accrued benefits liability that Plaintiff claims was recorded to account for Hughes' deferred compensation. The court noted that the accrued benefits liability did not correspond to a deferred compensation plan because the liability did not increase between 1996 and January 2002, a period during which Plaintiff claims a salary of over $80,000 was deferred annually.

Plaintiff faults the district court for discounting deposition testimony and for examining discrete pieces of evidence instead of viewing the evidence as a whole. Instead, Plaintiff argues, the district court should have applied the factors considered in *Henglein v. Informal Plan for Plant Shutdown Benefits for Salaried Employees*, 974 F.2d 391 (3d Cir. 1992). In determining whether an informal employee benefit plan existed, the *Henglein* court considered "internal or distributed documents, oral representations, existence of a fund or account to pay benefits, actual payment of benefits, a deliberate failure to correct known perceptions of a plan's existence, the reasonable understanding of employees, and the intentions of the putative sponsor." *Henglein*, 974 F.2d at 395.

Plaintiff correctly argues that the district court focused too narrowly on individual pieces of evidence and failed to consider deposition testimony. Although it is unnecessary to adopt the *Heinglein* factors as part of the *Dillingham* test, in considering "the surrounding circumstances" regarding Hughes' compensation, the individual board motions must be viewed in relationship to each other and in light of the deposition testimony of Carl Hughes and Robert Sorin. Carl Hughes, who was a member of UTCU's board in 1987, testified that the 1987 motion established a salary for Hughes that was equal to the amount Hughes had been receiving as Vice President of CWA. Carl Hughes also testified that Hughes deferred this salary. Sorin testified that a deferred compensation plan was created for Hughes in the mid-80s. Viewed in the light most favorable to Plaintiff, the 1999 board resolution is a clarification of the 1987 and 1989 motions establishing compensation for Hughes. The board resolution explicitly recognizes the 1987 motion's authorization of Hughes' salary and that the authorized salary had not been paid. The 1999 resolution also states that an accrued benefits account had been set aside for Hughes. Thus, the 1999 resolution, viewed in the

13

light most favorable to Hughes, establishes that Hughes' salary had been deferred and was reflected in an accrued benefits liability in UTCU's financial records.

Although viewing the evidence as a whole leads to the conclusion that UTCU had the intention to allow Hughes to defer compensation and to reflect this compensation in an accrued benefits liability, this evidence does not establish the reasonably ascertainable benefits necessary for the existence of a plan. As the Plaintiff would have this Court read the 1999 resolution, the resolution states that UTCU owes Hughes the salary of a CWA Vice-President but also provides that Hughes' accrued benefits would be contained in a specific account, the accrued benefits account. Yet, at no time did the amount of the accrued benefits liability correspond to the accrued CWA salary. Although Plaintiff claims that Hughes was owed a salary for each year between 1987 and 2002, DFI's 1996 report remarks that UTCU had no intention of increasing the accrued benefits liability in the near future. This intention was borne out by the fact that the amount of the accrued benefits liability did not change between 1996 and January 2002. The 1999 resolution states that Hughes is entitled to compensation but provides two contradictory indications of the amount to which Hughes is entitled, the salary of a CWA Vice President[6] and the amount of the accrued benefits liability. Thus, even upon the Plaintiff's reading of the facts, a reasonable person would not

---

[6]In itself, this indicator of the amount owed to Hughes is ambiguous. Plaintiff asserts that Hughes was entitled to the amount that CWA vice-president would have been paid for each of the years between 1987-1999. The only evidence presented regarding Hughes' pay level is the 1987 resolution authorizing him to be compensated at his "current pay level" and Carl Hughes' testimony that this language referred to Hughes' salary as a CWA Vice President. However, Plaintiff has pointed to no evidence to indicate whether Hughes' salary was to rise at the same rate as that of a CWA Vice President or whether he was to be awarded a fixed salary equal to the 1987 CWA salary level.

be able to ascertain the amount of deferred compensation owed Hughes. *See Williams v. WCI Steel Co., Inc.*, 170 F.3d 598, 603 (6th Cir. 1999) ("Assuming that plaintiffs were to prevail on their ERISA claim, the district court would have to fashion essentially all of the details of the purported plan and determine exactly what benefits would go to which employees or retirees, since no one can ascertain what WCI intended to provide for its workers.").

### 2. Procedure for Receiving Benefits

The parties dispute whether there exists a reasonably ascertainable procedure for obtaining benefits. Defendants claim that this prong of the *Dillingham* test has not been met because UTCU had no "ongoing administrative scheme." Plaintiff counters that the ongoing scheme requirement applies only to severance cases and that Hughes' assertion of a claim for benefits is sufficient proof that a reasonably ascertainable procedure existed to survive summary judgment.

In *Fort Halifax Packing Company, Inc. v. Coyne*, 482 U.S. 1 (1987), the Supreme Court held that a Maine statute that required certain employers to make a one-time severance payment to employees in the event of a plant closing was not pre-empted by ERISA. The *Fort Halifax* majority found an ongoing administrative scheme necessary for a "plan" within the definition of ERISA to exist:

> The Maine statute neither establishes, nor requires an employer to maintain, an employee benefit *plan*. The requirement of a one-time, lump-sum payment triggered by a single event requires no administrative scheme whatsoever to meet the employer's obligation. . . . To do little more than write a check hardly constitutes the operation of a benefit plan.

*Fort Halifax*, 482 U.S. at 12. This language can be read very broadly to exclude all arrangements that call for lump-sum payments from the ambit of ERISA. However, the *Fort Halifax* court addressed this concern by explaining that death benefits would still fit within this definition of a plan. *Id.* at 15 n.9. The Court noted that even though death benefits are generally paid in a lump sum, since it is predictable that former employees will die at various points in the future, the employer has to provide a mechanism for making "payments to survivors on an ongoing basis. The ongoing, predictable nature of this obligation therefore creates the need for an administrative scheme to process claims and pay out benefits, whether those benefits are received by beneficiaries in a lump sum or on a periodic basis." *Id.* Thus, a benefits arrangement that provides for a lump-sum payment to an employee may qualify as an ERISA benefits plan if the employer is potentially required to pay out benefits on a regular basis.

This Court has recognized that the ongoing administrative scheme requirement is a lesser hurdle than the reasonably ascertainable claims procedure requirement. *WCI*, 170 F.3d at 604 ("In our view, *Dillingham* requires more than just the existence of an administrative scheme. If a reasonable person cannot ascertain the claims procedures in a purported plan, then the plan is not an 'employee benefit plan' under ERISA."). Even when benefits are due in a lump-sum payment in a non-severance benefits scheme, there remains the possibility that benefits will need to be calculated and paid through the claims procedure at any time. *See Fort Halifax*, 482 U.S. at 15 n.9. *See also Kolkowski*, 448 F.3d at 849 (noting that an ongoing administrative scheme existed in part because the severance package "covered every involuntary termination over a two-year period"). Thus, the

claims procedure, a requirement for all ERISA benefits plans, in itself constitutes an ongoing administrative scheme.

In Hughes' case, the district court agreed with Defendants that no reasonably ascertainable claims procedure existed. Hughes argues that a genuine dispute of material fact remains regarding the existence of a claims procedure because Hughes made multiple attempts to claim benefits. Hughes asserts that since he presented a claim for benefits, a jury could infer that a claims procedure existed.

A specific claims procedure need not be set out in writing in order for the third *Dillingham* factor to be satisfied. *See Dillingham*, 688 F.2d at 1372 ("ERISA does not, however, require a formal, written plan."). As evidence of the existence of a procedure for receiving benefits, courts have been willing to accept past practices of plaintiffs in pursuing claims. In particular, when prior requests for benefits have been awarded as the result of a plaintiff taking action to present his claim to a plan administrator, courts have found that a reasonably ascertainable claims procedure exists. *See, e.g., Deibler v. UFCW*, 973 F.2d 206, 210 (3d Cir. 1992); *Whitfield v. Torch Oper. Co.*, 935 F. Supp. 822, 828 (E.D. La. 1996). However, there is little guidance in the case law regarding the inference to be drawn when no claims have been processed or have resulted in the award of benefits.

In discussing whether a claims procedure exists, the parties focus on the question of whether there is a specific person an applicant for benefits should contact to make a claim. This emphasis seems to be misguided because in situations where benefits are awarded automatically upon the occurrence of a stated contingency, this Court has not required the identity of the person to whom the claim is presented to be clear. *Kolkowski*, 448 F.3d at 850. As the *Dillingham* court specified,

17

this Court must look to all the surrounding circumstances to determine whether the claims procedure is reasonably ascertainable. In the instant case, there is little doubt that no claims procedure existed for deferred compensation benefits since there was no clear indication of the amount of compensation deferred, no specification of when the deferral was to end, and no indication of how the benefits would be received. On the other hand, the death benefits were more clearly set forth, specifying the amount of the benefit and the person to whom the benefit should be disbursed (Natalie Hughes). Even though there is more precision regarding this benefit, Plaintiff has given no evidence of how the death benefit is to be claimed. In fact, Hughes attempted to claim the benefit as a disability benefit before his death, exhibiting some uncertainty regarding the nature and claims procedure for this benefit. Even if this Court takes Hughes' actions in attempting to claim benefits into account, the evidence shows that no reasonably ascertainable claims procedure existed.

Plaintiff claims that even if no reasonably ascertainable claims procedure exists, a plan may by governed by ERISA. For this contention, Plaintiff cites 29 C.F.R. § 2560.503-1(l):

> Failure to establish and follow reasonable claims procedures. In the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a) of the Act on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim.

Plaintiff argues that this Department of Labor regulation implies that a benefits scheme may be governed by ERISA despite its failure to establish a claims procedure. However, we believe that it would be more reasonable to interpret 29 C.F.R. § 2560.503-1(l) as explaining that exhaustion of remedies will not be required when claim procedures are deficient instead of interpreting the

regulation as doing away with the reasonably ascertainable claims procedure requirement. This interpretation is consistent with the regulation as a whole since 29 C.F.R. § 2560.503-1 explains in detail the claims procedures employers are required to put in place to comply with ERISA. *See e.g.* 29 C.F.R. § 2560.503-1(b)(3) (prohibiting employers for charging a fee for claims procedures and noting that such a procedure would not be deemed reasonable). Viewed in this light, 29 C.F.R. § 2560.503-1(l) would free claimants from having to comply with unduly onerous, but still reasonably ascertainable claim procedures. Thus, the lack of a reasonably ascertainable claims procedure is fatal to Hughes' ERISA claims.

## II.     DUE PROCESS CLAIM

### A.     Standard of Review

As stated above, we review a district court's disposition of a motion for summary judgment *de novo.*

### B.     Analysis

In order to bring a claim for a violation of due process, a plaintiff must show that the state has deprived him of a protected property interest. For a person to have a property interest in a benefit, the person must have more than a one-sided expectation of receiving the benefit but also "a legitimate claim of entitlement to it." *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972). Even when a protected property interest exists, a deprivation of that interest is not a violation of the due process clause unless the procedure by which the state deprives the owner of the property interest is inadequate. *Midkiff v. Adams County Regional Water Dist.*, 409 F.3d 758, 762 (6th Cir. 2005).

19

The district court dismissed Plaintiff's claim because it found that bringing a suit under state contract law would be an adequate procedure to vindicate any property interest Plaintiff had in claimed benefits. For this conclusion, the district court relied upon *Lujan v. G & G Fire Sprinklers, Inc.*, 532 U.S. 189 (2001). In *Lujan*, a subcontractor that was denied payment for services performed for the state of California brought a 42 U.S.C. § 1983 action against the state claiming that it had been deprived of property without due process of the law because no hearing was held regarding the denial of payment. *Id.* at 191-92. The Supreme Court held that assuming the subcontractor was deprived of a property interest, the deprivation was not a violation of procedural due process because the subcontractor could bring a breach of contract suit in state court. *Id.* at 197. The Court held that the ordinary judicial process sufficed because the subcontractor had not been deprived of a "present entitlement." *Id.* at 196. Although *Lujan* contains little discussion of what constitutes a present entitlement, the Court distinguished the subcontractor's situation from that in which "the claimant was denied a right by virtue of which he was presently entitled either to exercise ownership dominion over real or personal property, or to pursue a gainful occupation." *Lujan*, 532 U.S. at 196.

In distinguishing the type of interests for which a breach of contract suit would provide adequate process and interests for which due process necessitated a reasonably prompt hearing, the Court discussed cases in which it had held that a hearing was necessary. In *United States v. James Daniel Good Real Property*, 510 U.S. 43 (1993), the Supreme Court held that the government must hold a hearing before seizing a house subject to forfeiture. In *Barry v. Barchi*, 443 U.S. 55 (1979), the Court held that a racetrack trainer was entitled to a prompt post-deprivation hearing upon his suspension from training. In *FDIC v. Mallen*, 486 U.S. 230 (1988), the Court held that a bank

official was entitled to a post-deprivation hearing after being suspended from participating in his bank's affairs. Finally, in *Sniadach v. Family Finance Corp. of Bay View*, 395 U.S. 337 (1969), the Court determined that "due process requires notice and a hearing before wages may be garnished." *Lujan*, 532 U.S. at 196.

Defendants argue that Plaintiff's claim resembles that of G & G Fire Sprinklers in *Lujan* and not those which the Court held to be claims regarding present entitlements. Defendants base this argument on the disputed nature of Plaintiff's claim for benefits and the fact that the deprivation of the disputed benefits have not deprived Plaintiff of the ability to pursue a gainful occupation. Plaintiff attempts to characterize his interest in deferred compensation and death benefits as similar to the interest of the petitioner in *Sniadach*. Plaintiff argues that like Sniadach, Hughes earned wages, and those wages were being held by his employer, UTCU. However, as Defendants note, in *Sniadach*, absent the garnishment, the entitlement of the petitioner to the underlying wages was undisputed. *Sniadach*, 395 U.S. at 338 (garnishment concerned wages "earned by petitioner and unpaid"). By contrast, in the instant case, whether a wage was earned at all is unclear. Because of the uncertainty regarding whether Plaintiff is entitled to payment, Plaintiff's case more closely resembles *Lujan* than *Sniadach*, and, as a result, Plaintiff has no present entitlement and no right to a post-deprivation hearing other than the normal judicial process.

## III. ASI'S COUNTERCLAIMS

### A. Standard of Review

As stated above, this Court reviews the district court's grant of summary judgment *de novo.* The district court's grant of a motion to dismiss is also reviewed *de novo. Dubay v. Wells*, 506 F.3d 422, 427 (6th Cir. 2007). A motion to dismiss may be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief." *Id.* (quoting *Ricco v. Potter*, 377 F.3d 599, 602 (6th Cir.2004)). All factual allegations must be viewed in the light most favorable to the plaintiff, and this Court must make all reasonable inferences from the facts in the complaint in favor of the plaintiff. *Id.*

### B.    Analysis

The district court granted Plaintiff's motions for summary judgment on ASI's counterclaims and Plaintiff's motion to dismiss the counterclaims because the court found that ASI was never properly appointed as UTCU's conservator and thus lacked standing to bring the counterclaims. The district court held that pursuant to Ohio law, a conservator may only be appointed by the Superintendent of the Division of Financial Institutions and not by the Deputy Superintendent for Credit Unions. Since ASI was appointed conservator of UTCU by Roberts, Acting Deputy Superintendent of Credit Unions, the district court held that ASI lacked standing to bring counterclaims against Plaintiff.

Defendants ask this Court to either vacate or reverse the district court's grant of summary judgment for Plaintiff and its dismissal of ASI's counterclaims for a variety of reasons. Defendants argue that the judgment should be vacated because ASI's counterclaims were rendered moot by the district court's grant of summary judgment on Plaintiff's ERISA claims, by DFI's re-appointment

of ASI as UTCU's conservator, and by the state courts' assumption of exclusive jurisdiction over any challenge to the appointment of a conservator. Alternatively, Defendants assert that this Court should reverse the district court on the merits.

Pursuant to Article III of the Constitution, federal courts "may only adjudicate actual, ongoing controversies." *Honig v. Doe*, 484 U.S. 305, 317 (1988). Thus, a case must present "a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975) (quoting *North Carolina v. Rice*, 404 U.S. 244, 246 (1971)). The Supreme Court has recognized that an action may become moot at any stage of review. *United States Bancorp Mortg. Co. v. Bonner Mall Partnership*, 513 U.S. 18, 21 (1994). "When a civil case becomes moot pending appellate adjudication, the established practice in the federal system is to reverse or vacate the judgment below and remand with a direction to dismiss." *Stewart v. Blackwell*, 473 F.3d 692, 693 (6th Cir. 2007) (en banc order) (quoting *Coalition for Gov't Procurement v. Federal Prison Indus., Inc.*, 365 F.3d 435, 484 (6th Cir. 2004) (internal quotation marks omitted)). However, vacatur is not appropriate in all cases and is generally utilized "to avoid entrenching a decision rendered unreviewable through no fault of the losing party." *Id.*

Defendants assert that ASI's counterclaims were meant as a setoff to Plaintiff's ERISA claim and were rendered moot when the district court granted summary judgment for Defendants on the ERISA claim. A claim that a judgment in favor of a plaintiff be set off to compensate for the plaintiff's wrongdoing would necessarily be mooted by a dismissal of the plaintiff's claim. *See Sweet Pea Marine, Ltd. v. APJ Marine, Inc.*, 411 F.3d 1242, 1251 (11th Cir. 2005). However, ASI's

23

answer in which it sets forth its counterclaims does not frame the counterclaims as conditional upon the success of Plaintiff's ERISA claim. ASI's answer states:

> Defendant ASI asserts these claims for affirmative relief and, alternatively, to the extent this Court were to find that Plaintiff Hughes is otherwise entitled to employee benefits under ERISA, for forfeiture, mitigation, restitution, set-off, and recoupment.

(J.A. 96.) Because ASI's request for relief as a set-off to any damages awarded Plaintiff was clearly a fallback from its main request for affirmative relief, ASI's argument that its counterclaims were mooted by the disposition of Plaintiff's ERISA claim is not convincing.

Defendants also assert that Plaintiff's challenge to ASI's standing has become moot because DFI has re-appointed ASI as UTCU's conservator pursuant to undoubtedly legitimate procedures. Although we agree that DFI's re-appointment of ASI moots the question of whether ASI had standing to pursue litigation, this fact alone is insufficient to require vacatur of the district court's judgment. The Supreme Court has made clear that vacatur is proper where appellate review results from the unilateral action of the party that prevailed below or is "prevented through happenstance." *Bonner Mall*, 513 U.S. at 22-23 (quoting *United States v. Munsingwear, Inc.*, 340 U.S. 36, 40 (1950)). The Court explained that the equitable tradition of vacatur ensures that a losing party is not bound by a ruling that is set in stone due to "the vagaries of circumstance" or the prevailing party's unilateral action. *Id.* at 25. However, when the losing party causes mootness by his own action "[t]he judgment is not unreviewable, but simply unreviewed by his own choice." *Id.* Thus, absent exceptional circumstances, vacatur is inappropriate where the party that lost at the district court caused the mootness by settlement or other actions of its own. *Id.* at 29. As a result, DFI's

reappointment of ASI as UTCU's conservator cannot justify vacatur of the district court's judgment unless justified by extraordinary circumstances.

Defendants argue that vacatur is necessary because Ohio courts have exclusive jurisdiction over challenges to administrative orders. In support of their contentions, Defendants cite *Gaunce v. deVincentis*, 708 F.2d 1290 (7th Cir. 1983), and *Green v. Brantley*, 981 F.2d 514 (11th Cir. 1993), for the proposition that "collateral attacks upon administrative orders are not permissible." (ASI Br. 57 (quoting *Gaunce*, 708 F.2d at 1293).) *Gaunce* and *Brantley* are inapposite because both address the ability of federal courts to entertain collateral attacks on federal administrative orders. The Supreme Court has held that "where Congress has provided statutory review procedures designed to permit agency expertise to be brought to bear on particular problems, those procedures are to be exclusive." *Whitney Nat. Bank in Jefferson Parish v. Bank of New Orleans & Trust Co.*, 379 U.S. 411, 420 (1965). Defendants' arguments fail to provide a basis for any contention that the federal courts lack the ability to exercise jurisdiction with respect to an action grounded in the ERISA statute. As a result, ASI's argument that the district court lacked jurisdiction to determine ASI's standing is unpersuasive.

Defendants also argue that vacatur is appropriate because the district court's judgment relied upon a decision by the Franklin County Court of Common Pleas that was subsequently overruled on appeal. The district court specifically relied upon the Ohio court's holding that ratification by the Superintendent of the Division of Financial Institutions after the fact was insufficient to remedy an invalid appointment of a conservator. Defendants claim that this reliance is undermined by the fact that the Common Pleas' court's decision was overturned. However, the Ohio Court of Appeals

overturned the lower court's decision solely upon procedural grounds that do not undermine the substantive basis of the lower court's holding. As a result, Defendants have made no showing of extraordinary circumstances, and vacatur is inappropriate. Thus, we dismiss ASI's appeal of the dismissal of its counterclaim as moot.

## CONCLUSION

Based upon the foregoing analysis, this Court **AFFIRMS** the district court's grant of summary judgment for Defendants on all of Plaintiff's claims and **DISMISSES AS MOOT** ASI's appeal of the dismissal and grant of summary judgment on its counterclaims.